UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
                                             :

JAMI FLOYD,                                    :

                                        :

                    Plaintiff,          :

                                    :    23-CV-_____

           - against -           :

                                    :    **COMPLAINT**

NEW YORK PUBLIC RADIO,        :

                                    :    **JURY TRIAL DEMANDED**

                    Defendant.     :

                                    :
------------------------------------------------------------------- x

       Plaintiff Jami Floyd ("Floyd"), by and through her attorneys, Cerasia Law LLC, for her Complaint against defendant New York Public Radio ("NYPR"), alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

       1.      Floyd is a Black female. She is an attorney and highly respected, well-known and award-winning broadcast journalist, legal and political analyst, and television and radio host. Floyd is nationally and internationally regarded as an expert on the intersection of race and law.

       2.      In January 2009, Floyd started providing her services as a legal analyst and guest host to WNYC, a radio station owned by NYPR. She became an employee of NYPR in June 2015, as the local host for *All Things Considered* on WNYC. She voluntarily resigned from her employment in April 2022.

       3.      Floyd was reluctant to accept employment with NYPR in 2015, because it had a reputation of not supporting Black employees, but she did so after senior leadership told her that she would have a significant editorial voice in the Newsroom, and would ultimately be in line to replace Leonard Lopate when he stepped down as the host of *The Leonard Lopate Show* on WNYC. Based on those assurances, Floyd commenced her employment with NYPR.

4.     Shortly after starting her employment with NYPR, however, Floyd faced a racially hostile work environment, where she was bullied, demeaned and undermined. This behavior continued throughout her employment, and amounted to a continuing violation of her rights under the anti-discrimination laws.  Despite being a talented, well-educated and smart Black woman with significantly more experience than most employees in the Newsroom at WNYC, it was made clear to Floyd that she was not respected, editorially trusted or admired.

5.     Throughout the years of her employment, Floyd complained repeatedly to senior leadership, Human Resources and the Board of Trustees about this hostility, but no action was taken. All the while, and despite her valiant effort to move her career forward, her career was derailed.  Indeed, like many employees of color at WNYC, Floyd was hazed by supervisors and, despite prior assurances, was not given plum assignments, shows or time slots, and her editorial ideas were not supported and mostly disregarded. As Floyd asserted herself, the work environment became more hostile, with management and editors in the Newsroom sidelining her and preventing her from excelling at her job. This created a retaliatory hostile work environment for Floyd and was a continuing pattern and violation throughout her employment. At the same time, management responsible for show development led Floyd to believe that WNYC had plans to elevate her to the daytime host slot as soon as it became available.

6.     Leadership also asked Floyd, as a prominent Black talent at WNYC, to support her Black colleagues who were struggling in a culture that did not support them and to act as a diverse spokesperson to help NYPR raise money, which she did for many years as the Black poster woman for WNYC. Floyd routinely met with Black staff in her studio and off campus to talk about their trials and tribulations at NYPR. As the only on-air Black news host, and the only Black woman,

Floyd was held out as a leader on issues of race and gender, a role she responsibly fulfilled, despite the toll it took on her time, energy and spirits.

7.      Between at least 2017 and 2021, NYPR continually denied Floyd advancement to host shows that she was more than qualified to host – and for which she regularly filled in as the host – and deprived her of just compensation and paid her less than non-Black hosts to whom she should have been compared because of her race and prior complaints about discriminatory treatment.

8.      Floyd brings this lawsuit against NYPR to recover lost wages, compensatory damages and punitive damages, as well as declaratory and equitable relief to redress NYPR's continuous violation and pattern of unlawful race discrimination and retaliation that deprived her of advancement and promotion and resulted in lower compensation than comparators, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 *et seq.* ("Section 1981"); the New York State Human Rights Law, N.Y. Exec. Law § 296 ("SHRL"), and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq.* ("CHRL").

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Floyd's Section 1981 claims pursuant to 28 U.S.C. §§ 1331 and 1343.

10.      This Court has supplemental jurisdiction over Floyd's SHRL and CHRL claims pursuant to 28 U.S.C. § 1367(a).

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## PARTIES

12.     Floyd, who resides in Manhattan, was employed by NYPR and worked at WNYC from 2015 through early-2022, when she voluntarily resigned from her employment.

13.     NYPR is a not-for-profit corporation, incorporated in 1979, and is a publicly supported organization based in Manhattan.  NYPR owns the radio station known as WNYC.

## FACTS

14.     Floyd graduated from Binghamton University in 1986, with a B.A. in political science and a concentration in Journalism. In 1989, she graduated with honors from the University of California Berkeley School of Law, where she had been an associate editor of the *Law Review*, President of her class and salutatory speaker at graduation.

15.     After graduating law school, Floyd was a law clerk to an Associate Justice on the California Supreme Court. Thereafter, she was in the private practice of law at Morrison Foerster in San Francisco, and later worked as a public defender in San Francisco.

16.     In 1993, Floyd was selected to serve as a White House Fellow in the Clinton Administration, where she spent the majority of her time advising the Vice President on issues of crime, youth violence and the judiciary. During her fellowship year, Floyd also worked in First Lady Hillary Clinton's "Health Care War Room."

17.     After her time working in the White House, Floyd received a Master of Laws degree in 1996 from Stanford University Law School, where she also worked as a teaching fellow.

18.     While at Stanford, Floyd began serving as a legal analyst at CBS News. She was a founding member of Court TV, co-anchoring a show in prime time. From there, Floyd joined ABC News to help lead the Law & Justice Unit, and later returned to Court TV to host her own two-

hour daily talk show. Floyd also has worked as a Chief Legal Contributor for Al Jazeera America and as a legal and political analyst at MSNBC and PBS.

19.     In 2009, Floyd started providing her services as a legal analyst and guest host to WNYC. She became an employee of NYPR in 2015, as the local host for *All Things Considered* on WNYC.  Floyd remained the host of *All Things Considered* until she was moved to the Race & Justice Unit in September 2020.

20.     Floyd was reluctant to accept employment with NYPR, but she did so after the then-Vice President for News, Jim Schachter, promised that she would have, among other things, a significant editorial voice in the Newsroom and would contribute creatively to the news cycle. Then-Chief Content Officer, Dean Cappello, also told Floyd that she would be in line to replace Leonard Lopate, then-age 75, when he stepped down as the host of *The Leonard Lopate Show* on WNYC.  Based on those assurances, Floyd commenced her employment with NYPR.

21.     Shortly after starting her employment with WNYC, however, Floyd began facing a racially hostile work environment, where she was bullied, demeaned, and undermined. Despite being a talented and smart Black woman, with 20+ years of experience in the news industry – more than her two direct supervisors and most other journalists in the Newsroom – it was made clear to Floyd that she was not respected, editorially trusted, or admired. Throughout the years of her employment, Floyd complained repeatedly to NYPR senior leadership and Human Resources. She even brought her concerns about this hostility to the Board of Trustees, including to Executive Committee member Jonelle Procope, who is African-American, but no action was taken. All the while, Floyd's career was derailed. Indeed, like many employees of color at WNYC, Floyd was hazed by supervisors, and despite prior assurances, she was denied the opportunity to advance or receive plum assignments, and her editorial ideas were not supported and were mostly disregarded.

22.     As Floyd asserted herself, the work environment became more hostile, with management and editors in the Newsroom sidelining her and preventing her from excelling at her job. This created a retaliatory hostile work environment for Floyd and was a continuing pattern and violation throughout her employment. At the same time, management asked Floyd, as a prominent Black talent at WNYC, to support her black colleagues who were struggling in a culture that did not support them. Floyd routinely met with Black staff in her studio and off campus to talk about their trials and tribulations at NYPR. As the only Black on-air news host, and a woman, she was held out as a leader on issues of race and gender, a role she responsibly fulfilled, despite the toll it took on her time, energy and spirits.

23.     NYPR was not shy about trotting out Floyd as the Black poster woman to help it raise funds for WNYC.  Without hesitation, Floyd appeared at top-dollar fundraisers often – even when the white male hosts of talk shows did not do so, despite being paid substantially more than her. Floyd never missed a pledge drive, even though many white male hosts did not participate in the drives. Floyd provided a Black face at events that required one – including hosting and producing each year at the Apollo Theater to honor Dr. Martin Luther King. Floyd helped to raise millions of dollars over the years for NYPR.

24.     NYPR also leaned on Floyd to recruit Black people to apply for jobs there. This was very challenging for Floyd, given the race schism inside WNYC and her own experiences with being denied opportunities because of her race and opposition to race discrimination.

25.     In 2017, it was revealed that several male hosts at NYPR had engaged in sexual harassment. Floyd was one of many women who complained about the sexually-charged work environment at WNYC.

26.     In 2017, Schachter sought to terminate Floyd's employment after she complained about fellow host John Hockenberry's sexual harassment of staff, along with other problems in the Newsroom.  Floyd survived Schachter's retaliatory conduct at that point, but her work environment became more hostile and challenging as a result.

27.     Despite the retaliatory environment, Floyd helped WNYC deal with the fallout of long-standing unlawful and reprehensible conduct by Caucasian male show hosts Hockenberry, Lopate and Jonathan Schwartz. She remained one of only two female news hosts at WNYC, and the only Black news host amid a scandal that was all about race and gender.

28.     On the day that WNYC suspended Lopate in December 2017, Schachter and Cappello promised Floyd in conversations, which they followed up in emails, to elevate her to take over Lopate's midday show. The promises from Cappello and Schachter were designed to keep Floyd at WNYC during a time of bleak public relations around race and gender, as well as keep her silent about the real problems she witnessed behind the scenes. But, Schachter and Cappello did not follow through with those promises, and that was because of her race and prior complaints about discriminatory and harassing conduct. As Floyd would later realize, this was just the beginning of NYPR's continuous pattern of race discrimination and retaliation against her and was consistent with the pattern of mistreatment of other Black employees over the years.

29.     In July 2018, Schachter announced he would be forming a committee to design a new midday show, thereby publicly humiliating Floyd by denying her the host-chair in the time slot previously occupied by Lopate and forcing her to audition for a role she long ago had been promised. While Floyd had been promised that job in December 2017, she went along with the midday audition process hoping that, after one final step, the promise would be honored in the end. By this point, Cappello had been pushed out of WNYC in the wake of allegations of sexual

harassment against top hosts at WNYC and, upon information and belief, concerns about his own inappropriate conduct.

30.    On July 16, 2018, Schachter called Floyd to a meeting and, when she showed up, Chief Human Resources Officer Dana Teplitsky and Executive Editor for News Sean Bowditch were present. Floyd was concerned with Teplitsky's presence at the meeting, and she asked if she was "being fired." Schachter told her that she was not being fired, but that she was not getting the midday timeslot, and he "wanted witnesses" present for that news. In Floyd's experience, it was unusual for Schachter to have Human Resources present for a meeting. Teplitsky's presence suggested to Floyd that something was awry, because, had this been an ordinary selection process, Teplitsky would not have been present to deliver this news. Floyd has no doubt that she was denied this long-awaited and promised opportunity to host because of her race and her advocacy on behalf of victims of Hockenberry and Lopate, her constant questions about diversity and inclusion at WNYC, and her refusal to kowtow to the mostly male and all-white editor pool in the Newsroom, instead standing up for editorial empowerment on *All Things Considered*.

31.    Within an hour after that July 2018 meeting, Floyd met with then-President Laura Walker, making it clear that she was disappointed with the midday host decision, and saying the process was discriminatory. Floyd also detailed the racially discriminatory treatment she had endured and noted that there was a great imbalance around compensation at WNYC based on race. Floyd specifically told Walker that, as a Black woman, she felt "devalued," noting that she did not have an office, staff or other appropriate support for a show as demanding as *All Things Considered*, while her Caucasian male counterparts on less demanding shows had large staffs and budgets. Shortly thereafter, Floyd also had a conversation with NYPR's Deputy General Counsel, Janna Freed, about her complaints of discrimination, which was the first of several such

conversations with Freed about discriminatory treatment. Floyd also spoke with Board of Trustee Jonelle Procope about these concerns.

32.     For instance, Floyd was earning approximately $160,000 for hosting *All Things Considered* on the air for 4 hours per day (plus pre-tape time) – among other duties, including, for example, reporting from the field, serving as the legal analyst supporting all WNYC's programming and representing NYPR at off-site fundraising events – and yet was making about the same or less than staff who supported the *Brian Lehrer Show*.  Floyd also was paid considerably less than Caucasian talk show hosts – some of whom she filled in for – even though she was at least equally as qualified as them, if not more qualified. Floyd's complaints led NYPR to conducting a workplace investigation.

33.     Despite not getting the long-anticipated midday slot, Floyd continued to present ideas in the Newsroom about programming that focused on race and gender-related issues – including opportunities to interview leading civil rights activists, high-profile politicians, and women of prominence to whom she had access.  She suggested alternative program ideas – some of which were picked up at other stations after WNYC ignored them or shot them down.  Despite Floyd's tireless efforts, however, Schachter, his successors and the Newsroom continued to give Floyd little support.

34.     Until the day Schachter was forced to leave WNYC in 2019, he continued to display his open hostility toward the advancement of Black employees, stating in 2018 with the arrival of Depelsha McGruder that "now we have a black COO.  What's next, a Black president?"  Schachter also made other racially hostile comments over the years, including one he made just before a NY Association of Black Journalists event, when he said that he could not compete sartorially with all

the Black people in the room since, in his view, Black people always would out-dress him.  These are just some examples.

35.     Racial insensitivity was part of the culture at WNYC. In May 2019, WNYC instituted its infamous "n-word" policy to manage the use of the n-word on its airwaves.  From the start, WNYC pulled Floyd, as its token Black news talent, into this conversation, which was draining for her and demeaning. WNYC set up an emergency editorial committee to navigate the use of the word on-air at all hours of the day and night. It came to be called the "Black Editorial Committee," to the chagrin of Black employees, including Floyd. Serving on the Committee was taxing and exploitative for Floyd, requiring significant time and emotional energy, with no extra compensation. WNYC simply used Floyd for the color of her skin. Other Black employees felt similarly abused.

36.     In 2019, Walker and Schachter left WNYC, and new CEO Goli Sheikholeslami arrived in the Summer 2019. Unfortunately, the culture did not change, and challenges at WNYC remained around race and equity. As Floyd had stated to Walker in her office and many times during staff meetings, "the true measure of a company is in who gets hired, who gets promoted, whether people are compensated equitably, and who is leaving the company and why."  In 2019, WNYC clearly was falling short in all those metrics. Floyd tried to meet with Sheikholeslami and new Chief Content Officer Andrew Golis, who also arrived in 2019, on more than one occasion to share her experiences at WNYC, but they did not meet with her until they were in crisis in 2021, with the hiring of a controversial new Editor-in-Chief for the Newsroom.

37.     Given that Sheikholeslami and Golis ignored Floyd's requests for a meeting about Newsroom culture, starting in the winter of 2019, Floyd had meetings with Leah Johnson, then a new member of the Board of Trustees and an African-American. During her meetings with

Johnson, Floyd expressed great concern about the work culture, environment and mistreatment of Black employees at WNYC. Floyd even arranged for Johnson to meet off-site with eight Black employees in early-June 2019 – seven of whom later left WNYC, at least in part because of challenges they faced as Black employees. These Black employees recounted to Johnson their negative experiences as Black employees at WNYC. Those meetings put the Board on notice about the continuing hostile work environment for Black employees, including the lack of support for their work and ideas and the headwinds they faced as employees at WNYC. Even then, no corrective action was taken, which sent the message to Floyd and her fellow Black employees that NYPR condoned this race-based conduct.

38.     Throughout her employment, Floyd continued to be bullied and harassed, including by Program Director Jacqueline Cincotta and Supervising Senior Producer Richard Yeh, which created on-going challenges for her in the Newsroom and prevented her from performing her job duties. This conduct included, but was not limited to, verbal bullying, a reporting structure different from other similarly-situated, non-Black hosts, and denial of an editor title that was granted to similarly-situated and far less experienced, non-Black employees. This pattern of conduct was designed to make Floyd feel uncomfortable and unwelcomed, and it did.  This conduct also directly and negatively impacted her ability to perform her duties, her productivity, her job satisfaction and her emotional well-being.

39.     On June 24, 2019, Floyd lodged a complaint with the Human Resources Business Partner for News, Rebecca Shapiro, about the abuse from Cincotta. Yet, no action was ever taken by Shapiro or WNYC. Floyd had also put CEO Laura Walker and Schachter on notice about Cincotta before their departures, but they also failed to take any corrective action. Floyd had made similar complaints on November 28, 2018, to WNYC's outside consultant, Equitable, but no action

was taken in response to her complaints at that point, either. Thus, it was clear to Floyd that WNYC condoned this unlawful conduct by Cincotta, which was well-known throughout the building.

40.     Floyd's request for an "editor" title started in 2019, during Schachter's tenure, and continued with the Interim News Director and through to the hiring of a new Editor-in-Chief in June 2020. Despite the fact that Floyd had spent over a decade as WNYC's go-to legal analyst and *de facto* editor, WNYC still resisted giving her this title. At the same time, non-Black employees with far less journalism experience were given editor titles. Since the other editors did not have the expertise to edit legal stories, they routinely turned to Floyd to do so.

41.     After Floyd had complained to Human Resources in June 2019, the SAG-AFTRA union, and even the new CEO about this issue, WNYC finally gave her a "Legal Editor" title in August 2020.  Even then, there was no announcement of this title, or recognition of any kind, even though management regularly sent out notices to announce similar title changes and other achievements, which demonstrated to Floyd, yet again, that WNYC was treating her differently than non-Black employees who were publicly acknowledged for such title or role changes. Moreover, WNYC was not going to give Floyd any additional compensation for this role, until the union intervened. As a result, WNYC paid Floyd a paltry amount for this new title (based only on projected overtime which they asked her to calculate), despite her vast experience and contributions. Floyd believes that she was paid significantly less than non-Black hosts to whom she should have been compared over several years and through the end of her employment, and that discovery in this lawsuit will reveal this pay inequity.

42.     By 2020, Bowditch was running the Newsroom as the Interim News Director and the work environment became worse as WNYC searched for Schachter's replacement. Floyd continued to strive to advance her career at WNYC, and had applied for the vacant role of Vice

12

President, News in November 2019, after Schachter had been dismissed by WNYC and the role was open. Floyd was hopeful the new management, including Sheikholeslami and Golis, would be open to a more diverse C-Suite. Floyd was granted an interview for the role, and she used that interview as an opportunity to share her ideas for improving the Newsroom, especially around racial and gender diversity. As Sheikholeslami and Golis were conducting a listening tour in the Newsroom concerning who they should hire for the position, Newsroom staffers were vocal in their opinion that WNYC needed a person with broadcast news experience, a native New Yorker (or least someone who knew the market), and a person of color to fill the role.

43.     Nonetheless, in June 2020, WNYC selected Audrey Cooper to be the Editor-in-Chief.  Over 150 employees signed a petition opposing the hiring of Cooper. Notably, Floyd did not sign the petition despite being passed over, yet again, for a promotion, this time in favor of a less-qualified Caucasian, who had no knowledge of New York City and had no broadcast experience.  Floyd is a native New Yorker and had two decades of broadcast news experience at that point in time. WNYC's failure to select Floyd or someone from the pool of other diverse candidates for this role is further evidence of racial bias.

44.     When Sheikholeslami and Golis asked Floyd about the petition, Floyd explained that employees were on edge, that they did not trust management dating back to the unlawful conduct of Hockenberry and others, and that this hiring decision reinforced the notion that management did not listen to or value input from staff. This hiring decision and the subsequent conversations occurred at the time of George Floyd's murder and related protests. Floyd specifically told Sheikholeslami and Golis that, in this time of racial reckoning, WNYC's culture was not supportive of Black employees. Strangely, Sheikholeslami started to cry, at which point Floyd told her that she (Floyd) was the one who did not get the job given to Cooper and, as the

only Black person in the Zoom meeting room at the time, she had been asked to share experiences to be helpful to management. Sheikholeslami's emotion was misplaced and inappropriate.

45. WNYC's decision to interview Floyd for the Editor-in-Chief role was part of a sham process, as Golis had previously worked in the Bay Area where Cooper also was from and, upon information and belief, had a preference to hire Cooper from the start. Floyd has no doubt that WNYC's decision to interview her was made to check a box that WNYC had interviewed a "diverse" candidate, similar to the "Rooney Rule" in the National Football League. A review of WNYC management over the past several years reinforces this belief, demonstrating a lack of representation of Black people in senior content leadership roles. At the same time, there was no lack of talented Black candidates, including Floyd, who was instead "promoted" in September 2020, in the wake of George Floyd's murder, to run a Race & Justice Unit that purported to cover communities of color.

46. Once she joined leadership, Cooper demonstrated her own strange brand of racial hostility, or insensitivity at best. For example, in her first meeting with Floyd, she said that WNYC was going to shutter the "Radio Rookies" program, a beloved, two decades-old program which gave Black and brown high school students the tools to tell radio stories about their under-represented communities. Floyd eventually persuaded Cooper to keep the program, as Cooper could not articulate a good reason for eliminating it, but Cooper then directed Floyd to manage the program. Cooper also demonstrated racial hostility toward employees of color, by making comments that smacked of racism and suggesting that South Asians were laconic and lazy (*e.g.*, repeatedly demeaning one employee of color for having "low metabolism" and another for "just not getting what we do here"). Cooper also told Floyd that she did not value these and other reporters, and then assigned those reporters to Floyd's team, thereby messaging to Floyd the low

14

esteem in which she held the Race & Justice Unit and creating what employees perceived to be a "reporting ghetto," sending a clear signal that the Race & Justice Unit was a dumping ground for purportedly failing reporters of color who were deemed problematic and not respected by management. By the end of 2021, all but one of the reporters who worked under Floyd in the Race & Justice Unit had been pushed out by Cooper or had left WNYC, leaving Floyd with a single reporter and further signifying to Floyd and her colleagues that the Race & Justice Unit was not a meaningful part of the Newsroom.

47.    Cooper and senior leaders simply did not support the Race & Justice Unit and never intended for it to thrive. While WNYC sought to spin Floyd's move to the Unit as a promotion, it was anything but. That move took Floyd off air to assume responsibility for a desk with no budget or authority to hire staff.

48.    Despite promises that Floyd could hire diverse reporters for the Race & Justice Unit, none were ever authorized – even though Floyd presented many qualified candidates. For instance, in June 2021, Floyd recommended hiring a multilingual Arab-American journalist with a degree from Columbia University's Graduate School of Journalism. Cooper told Floyd that she could not hire this journalist "because he is not Black." Floyd was shocked at the comment and reported this to WNYC's Chief Human Resources Officer, Monique Jefferson, and Freed, but nothing happened. At the same time, when Floyd fought to hire many qualified Black reporters, WNYC refused to approve those hires. Simply put, WNYC viewed the Race & Justice Unit as window dressing to make WNYC look good from a racial standpoint in the wake of George Floyd's murder, which also had the added benefit for management of removing Floyd from working on air.

49.     Despite this, Floyd did not allow her negative experiences at WNYC to dampen her enthusiasm for the work, supporting her team and winning awards for WNYC. In 2021, *The Vanishing of Harry Pace*, on which Floyd served as consulting producer and in which she appears throughout, was nominated for International Documentary Association Award. *Blindspot Tulsa Burning*, on which she served as an Editor, received the 2022 duPont Award from Columbia University and was a nominee for Outstanding Podcast at the NAACP Image Award that same year.

50.     In 2021, Floyd continued to endure WNYC's disregard for her and other Black talent. For instance, WNYC turned a blind eye to fellow editor Jen Chung's disclosure of confidential information to media outlets concerning Floyd, but WNYC management did nothing to stop Chung or correct the clear misinformation that was being reported about Floyd. When the *New York Times* incorrectly reported its story in November 2021 about articles under Floyd's name, WNYC's management admitted to Floyd that the *New York Times* article contained factual errors about Floyd and WNYC, but said WNYC would not be seeking a correction. Floyd lodged a formal complaint with Jefferson about Chung's behavior. Despite Jefferson's assurances that appropriate action would be taken, WNYC's management condoned and acquiesced in Chung's wrongful conduct, which, upon information and belief, was directly related to work of the Race & Justice Unit and therefore race-based. This conduct significantly damaged Floyd's reputation in the industry. WNYC's failure to take steps to stop Chung's wrongful behavior makes WNYC complicit in that conduct. Floyd also believes that WNYC did not take steps to curtail or end Chung's misconduct because it was retaliating against Floyd for her continued complaints of race discrimination.

51.     Throughout her time at WNYC, and especially after she was named Race & Justice Editor in 2020, Black employees sought counsel from Floyd about being ignored or disregarded at WNYC because of race. This treatment added to Black employees' stress, worry and feelings of anxiety and insecurity. This continued until Floyd's voluntary departure in April 2022. One such example involved a high-profile Afro-Latina, who experienced years of hostility and a lack of equal support at WNYC, and then was forced out of WNYC by July 2021. This Afro-Latina was vocal on Twitter at that time and often spoke with Floyd about her frustrations. Many other well-respected Black and brown employees left WNYC because of the continuous hostile work environment. One such former African-American employee told Floyd: "My time at WNYC was easily the worst five years of my career. I really don't want to revisit it, I'd rather not dredge up painful memories." Another Black person said: "My untethering from your current workplace [WNYC] was dramatic, difficult and quite stressful. The mental health professional in my life wisely advised me to create and honor serious distance between my now and my then. Just to heal & focus on starting anew." Current and former employees of WNYC continue to reach out to Floyd about their experiences with racism at WNYC.

52.     Despite Floyd's repeated and good-faith complaints about race discrimination, NYPR wholly ignored the law and its own anti-discrimination and anti-retaliation polices. Even though NYPR maintained that it will investigate claims of discrimination and retaliation, Floyd does not believe that NYPR appropriately investigated the complaints of discrimination and retaliation that she made during her employment. NYPR played lip service to those hollow policies and its commitment to employees that discrimination and retaliation is not tolerated at NYPR.

53.     NYPR's deplorable and inexplicable conduct, as described above and continued throughout Floyd's employment, demonstrated a willful and reckless disregard for Floyd's rights

under the applicable laws and caused her to lose wages and benefits and to suffer humiliation, embarrassment, pain and suffering, as well as damage to her career and reputation.

**FIRST CAUSE OF ACTION**
**Race Discrimination in Violation of Section 1981**

54.     Floyd incorporates herein by reference the preceding paragraphs as if fully set forth herein in their entirety.

55.     NYPR discriminated against Floyd on the basis of her race by denying her equal terms and conditions of her employment, including failing to promote her and paying her less than non-Black hosts to whom she should have been compared, in violation of Section 1981.

56.     As a direct and proximate result of NYPR's unlawful discriminatory conduct during the applicable statute of limitations period in violation of Section 1981, Floyd has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages.

57.     As a direct and proximate result of NYPR's unlawful discriminatory conduct during the applicable statute of limitations period in violation of Section 1981, Floyd has suffered, and continues to suffer, severe mental anguish and emotion distress including, but not limited to, embarrassment, humiliation, stress and anxiety and emotional pain and suffering for which she is entitled to compensatory damages.

58.     NYPR's unlawful and discriminatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Floyd, and was done with conscious or reckless disregard of her rights under the law, entitling her to punitive damages.

## SECOND CAUSE OF ACTION
### Retaliation in Violation of Section 1981

59.     Floyd incorporates herein by reference the preceding paragraphs as if fully set forth herein in their entirety.

60.     NYPR retaliated against Floyd by denying her equal terms and conditions of employment, by failing to promote her and by depriving her of compensation because of her complaints about race discrimination, in violation of Section 1981.

61.     As a direct and proximate result of NYPR's unlawful retaliatory conduct during the applicable statute of limitations period in violation of Section 1981, Floyd has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of income, compensation and benefits for which she is entitled to an award of monetary damages.

62.     As a direct and proximate result of NYPR's unlawful retaliatory conduct during the applicable statute of limitations period in violation of Section 1981, Floyd has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, embarrassment, humiliation, stress and anxiety and emotional pain and suffering for which she is entitled to compensatory damages.

63.     NYPR's unlawful and retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Floyd, and was done with conscious or reckless disregard of her rights under the law, entitling her to punitive damages.

## THIRD CAUSE OF ACTION
### Hostile Work Environment in Violation of Section 1981

64.     Floyd incorporates herein by reference the preceding paragraphs as if fully set forth herein in their entirety.

19

65.     NYPR denied Floyd equal terms and conditions of her employment as described above, including, but not limited to, subjecting her to and condoning a racially and retaliatory hostile work environment.

66.     As a direct and proximate result of NYPR's unlawful conduct in violation of Section 1981, which was a continuing violation during Floyd's employment, she has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled an award of monetary damages.

67.     As a direct and proximate result of NYPR's unlawful conduct in violation of Section 1981, Floyd has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, embarrassment, humiliation, stress and anxiety and emotional pain and suffering for which she is entitled to an award of compensatory damages.

68.     NYPR's unlawful conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Floyd, and was done with conscious or reckless disregard of her rights under the law, entitling her to punitive damages.

## FOURTH CAUSE OF ACTION
## Race Discrimination in Violation of the SHRL

69.     Floyd incorporates herein by reference the preceding paragraphs as if fully set forth herein in their entirety.

70.     NYPR discriminated against Floyd on the basis of her race by denying her equal terms and conditions of her employment, including failing to promote her and paying her less than non-Black hosts to whom she should have been compared, in violation of the SHRL.

71.     As a direct and proximate result of NYPR's unlawful discriminatory conduct during the applicable statute of limitations period in violation of the SHRL, Floyd has suffered, and

continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages.

72.     As a direct and proximate result of NYPR's unlawful discriminatory conduct during the applicable statute of limitations period in violation of the SHRL, Floyd has suffered, and continues to suffer, severe mental anguish and emotion distress including, but not limited to, embarrassment, humiliation, stress and anxiety and emotional pain and suffering for which she is entitled to compensatory damages.

73.     NYPR's unlawful and discriminatory conduct constitutes a willful and wanton violation of the SHRL, was outrageous and malicious, was intended to injure Floyd, and was done with conscious or reckless disregard of her rights under the law, entitling her to punitive damages.

## FIFTH CAUSE OF ACTION
### Retaliation in Violation of the SHRL

74.     Floyd incorporates herein by reference the preceding paragraphs as if fully set forth herein in their entirety.

75.     NYPR retaliated against Floyd by denying her equal terms and conditions of employment, by failing to promote her and by depriving her of compensation because of her complaints about race discrimination.

76.     As a direct and proximate result of NYPR's unlawful conduct during the applicable statute of limitations period in violation of the SHRL, Floyd has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of income, compensation and benefits for which she is entitled an award of monetary damages.

77.     As a direct and proximate result of NYPR's unlawful conduct during the applicable statute of limitations period in violation of the SHRL, Floyd has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, embarrassment,

humiliation, stress and anxiety and emotional pain and suffering for which she is entitled to an award of compensatory damages.

78.     NYPR's unlawful conduct constitutes a willful and wanton violation of the SHRL, was outrageous and malicious, was intended to injure Floyd, and was done with conscious or reckless disregard of her rights under the law, entitling her to punitive damages.

**SIXTH CAUSE OF ACTION**
**Hostile Work Environment in Violation of the SHRL**

79.     Floyd incorporates herein by reference the preceding paragraphs as if fully set forth herein in their entirety.

80.     NYPR denied Floyd equal terms and conditions of her employment as described above, including, but not limited to, subjecting her to and condoning a racially and retaliatory hostile work environment, in violation of the SHRL.

81.     As a direct and proximate result of NYPR's unlawful conduct in violation of the SHRL, which was a continuing violation during Floyd's employment, she has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of income, compensation and benefits for which she is entitled an award of monetary damages.

82.     As a direct and proximate result of NYPR's unlawful conduct in violation of the SHRL, Floyd has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, embarrassment, humiliation, stress and anxiety and emotional pain and suffering for which she is entitled to compensatory damages.

83.     NYPR's unlawful conduct constitutes a willful and wanton violation of the SHRL, was outrageous and malicious, was intended to injure Floyd, and was done with conscious or reckless disregard of her rights under the law, entitling her to punitive damages.

**SEVENTH CAUSE OF ACTION**
**Race Discrimination in Violation of the CHRL**

84.     Floyd incorporates herein by reference the preceding paragraphs as if fully set forth herein in their entirety.

85.     NYPR discriminated against Floyd on the basis of her race in violation of the CHRL by treating her less well because of race, denying her equal terms and conditions of employment, including paying her less than non-Black hosts to whom she should have been compared and failing to promote her.

86.     As a direct and proximate result of NYPR's unlawful discriminatory conduct during the applicable statute of limitations period in violation of the CHRL, Floyd has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

87.     As a direct and proximate result of NYPR's unlawful discriminatory conduct during the applicable statute of limitations period in violation of the CHRL, Floyd has suffered, and continues to suffer, severe mental anguish and emotion distress including, but not limited to, embarrassment, humiliation, stress and anxiety and emotional pain and suffering for which she is entitled to compensatory damages.

88.     NYPR's unlawful and discriminatory conduct constitutes a willful and wanton violation of the CHRL, was outrageous and malicious, was intended to injure Floyd, and was done with conscious or reckless disregard of her rights under the law, entitling her to punitive damages.

**EIGHTH CAUSE OF ACTION**
**Retaliation in Violation of the CHRL**

89.     Floyd incorporates herein by reference the preceding paragraphs as if fully set forth herein in their entirety.

90.     NYPR retaliated against Floyd by treating her less well and terminating her employment because of her complaints about race discrimination, in violation of the CHRL.

91.     As a direct and proximate result of NYPR's unlawful retaliatory conduct during the applicable statute of limitations period in violation of the CHRL, Floyd has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of income, compensation and benefits for which she is entitled an award of monetary damages.

92.     As a direct and proximate result of NYPR's unlawful retaliatory conduct during the applicable statute of limitations period in violation of the CHRL, Floyd has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, embarrassment, humiliation, stress and anxiety and emotional pain and suffering for which she is entitled to compensatory damages.

93.     NYPR's unlawful conduct constitutes a willful and wanton violation of the CHRL, was outrageous and malicious, was intended to injure Floyd, and was done with conscious or reckless disregard of her rights under the law, entitling her to punitive damages.

## NINTH CAUSE OF ACTION
### Hostile Work Environment in Violation of the CHRL

94.     Floyd incorporates herein by reference the preceding paragraphs as if fully set forth herein in their entirety.

95.     NYPR denied Floyd equal terms and conditions of her employment as described above, including, but not limited to, treating her less well because of her race and subjecting her to and condoning a racially and retaliatory hostile work environment, in violation of the CHRL.

96.     As a direct and proximate result of NYPR's unlawful conduct in violation of the CHRL, which was a continuing violation during Floyd's employment, she has suffered and

continues to suffer monetary and/or economic damages, including, but not limited to, loss of income, compensation and benefits for which she is entitled an award of monetary damages.

97.     As a direct and proximate result of NYPR's unlawful conduct in violation of the CHRL, Floyd has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, embarrassment, humiliation, stress and anxiety and emotional pain and suffering for which she is entitled to compensatory damages.

98.     NYPR's unlawful conduct constitutes a willful and wanton violation of the CHRL, was outrageous and malicious, was intended to injure Floyd, and was done with conscious or reckless disregard of her rights under the law, entitling her to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Floyd prays that this Court enter judgment in her favor and against NYPR and grant to her the following relief:

a.      A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein violate the laws of the United States and the State and City of New York;

b.      An order directing NYPR to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Floyd's employment and personal life;

c.      An award for all economic damages to be determined at trial, plus pre-judgment interest, to compensate Floyd for NYPR's unlawful conduct, including back pay and lost benefits;

d.      An award for all compensatory damages to be determined at trial, plus pre-judgment interest, to compensate Floyd for future pecuniary losses, emotional distress, pain, suffering, inconvenience, mental anguish, stress, anxiety, humiliation, embarrassment, loss of enjoyment of life and other nonpecuniary losses as allowable;

e.  An award to Floyd for punitive damages under Section 1981, the SHRL and the CHRL;

f.  An award to Floyd for the costs incurred in this lawsuit, together with reasonable attorneys' fees; and

g.  Such other and further relief as this Court deems appropriate.

## JURY DEMAND

Floyd demands a trial by jury on all issues of fact, her claims and damages herein.

Dated:  Roseland, New Jersey
   February 9, 2023

        CERASIA LAW LLC

        By_____
         Edward Cerasia II
        101 Eisenhower Parkway, Suite 300
        Roseland, New Jersey 07068
        646.525.4231
        ed@cdemploymentlaw.com

        Attorneys for Plaintiff
        *Jami Floyd*

26