UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
                                          :

JAMI FLOYD,                       :
                                           :

                            Plaintiff,     :
                                         :   23-CV-1096 (ALC-SC)

             - against -         :
                                         :

NEW YORK PUBLIC RADIO,      :
                                         :

                            Defendant.   :
                                         :
-------------------------------------------------------------------- x

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

September 25, 2023

Edward Cerasia II
CERASIA LAW LLC
101 Eisenhower Parkway, Suite 300
Roseland, New Jersey 07068
646.525.4231
ed@cdemploymentlaw.com

Attorneys for Plaintiff
*Jami Floyd*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES………………………………………………………...ii

I.   PRELIMINARY STATEMENT………..…………...…………………………………1

II.  FACTUAL BACKGROUND…………………………………………………………2

III. ARGUMENT……………………………………………………………………...16

     A.  THE COURT MUST ACCEPT FLOYD'S ALLEGATIONS
        AS TRUE AND CANNOT RESOLVE FACTUAL
        DISPUTES AT THIS STAGE……………………………………...………………16

     B.  FLOYD HAS PROPRLY PLED DENIAL OF ADVANCEMENT
        AND PROMOTION, DISCRIMINATORY PAY PRACTICE,
        HOSTILE ENVIRONMENT AND RETALIATION CLAIMS.……………………17

          1.  Floyd Has Given Fair Notice Of Her Claims For
             Discriminatory Failure To Advance Or Promote Her…………….…………18

          2.  Floyd Has Given Fair Notice Of Her Pay
             Discrimination Claims……………………………………………….…19

          3.  Floyd Has Given Fair Notice Of Her
             Hostile Work Environment Claims…………………………………….20

          4.  Floyd Has Given Fair Notice Of Her
             Retaliation Claims……………………………………..…….…………23

     C.  FLOYD'S ASSERTED CLAIMS ARE NOT TIME-BARRED……………………24

IV.  CONCLUSION ………………………………………………………...……25

## TABLE OF AUTHORITIES

### CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)……………………….………………...………………16

*Boykin v. Key Corp*., 521 F.3d 202 (2d Cir. 2008)…….………………….………………….…...16, 17

*DiBlasio v. Novello*, 344 F.3d 292 (2d Cir. 2003)………………………….……………17, 20

*Edelman v. NYU Langone Health Sys*.,
  2022 U.S. Dist. LEXIS 176681 (S.D.N.Y. 2022)……………………….………………………20

*Gillman v. Inner City Broad. Corp*.,
  2009 U.S. Dist. LEXIS 85479 (S.D.N.Y. 2009)…………………………………….………...16-17

*Graham v. Long Island R.R*., 230 F.3d 34 (2d Cir. 2000)…………….…………………………..20

*Harris v. City of N.Y*., 186 F.3d 243 (2d Cir. 1999)…………..………………………16, 24-25

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004)……………..…………………....24

*Koch v. Christie's Int'l Pub. Ltd. Co*., 699 F.3d 141 (2d Cir. 2012)………..…………………….16

*Lightfoot v. Union Carbide Corp*., 110 F.3d 898 (2d Cir. 1997)………………..………...25

*Matagrano v. N.Y. State Dep't of Corr. & Cmty. Supervision*,
  2021 U.S. Dist. LEXIS 96695 (N.D.N.Y. 2021)……………………..…………………………..25

*Mondelo v. Quinn*, *Emanuel, Urquhart & Sullivan*, *LLP*,
  2022 U.S. Dist. LEXIS 31075 (S.D.N.Y 2022)………………..…………..17-18, 20-22, 23, 25

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)………….…..…………...24

*Patane v. Clark*, 508 F.3d 106 (2d Cir. 2007)……………………………………………21-22

*Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252 (S.D.N.Y. 2014)…………..……………...22

*Pucino v. Verizon Communications, Inc*., 618 F.3d 112 (2d Cir. 2010)……………………21

*Santiago v. Acacia Network, Inc.*, 634 F. Supp. 3d 143 (S.D.N.Y. 2022)……………...21, 23

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)………..……………………...16

*Taylor v. City of New York*, 207 F. Supp. 3d 293 (S.D.N.Y. 2016)…………………………………24

*Tejada v. Mance*, 2008 U.S. Dist. LEXIS 85566 (N.D.N.Y. 2008)………………..………………17

*Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003)………………..………………………………………22

*Vaigasi v. Solow Mgmt. Corp.*, 2014 U.S. Dist. LEXIS 42277 (S.D.N.Y. 2014)…………..………21

*Volpe v. Nassau Cty.*, 915 F. Supp. 2d 284 (E.D.N.Y. 2013)…………….………………………………24

*Williams v. N.Y.C. Housing Auth.*,
  872 N.Y.S.2d 27, 39 (1st Dep't), *lv denied* 13 N.Y.3d 702 (2009)………………………………21

## **RULES**

Fed. R. Civ. P. (8)(a)(2)……………………………...………………………………………….*passim*

Fed. R. Civ. P. 12(b)(6)……………………………………………………………….*passim*

Plaintiff Jami Floyd ("Floyd") respectfully submits this memorandum of law in opposition to defendant New York Public Radio's ("NYPR's") Fed. R. Civ. P. 12(b)(6) motion to dismiss the Amended Complaint. As demonstrated below, the Court should deny NYPR's motion.

## I.  <u>PRELIMINARY STATEMENT</u>

In NYPR's motion to dismiss the Amended Complaint, it contends that Floyd has failed to allege sufficient facts to state a claim of race discrimination, retaliation or hostile work environment. (Defendant's Memorandum of Law in Support of Motion to Dismiss ("Def.'s Mem.") at 7.) As the Amended Complaint shows, nothing is further from the truth.

As an initial matter, NYPR ignores well-settled Supreme Court and Second Circuit law that Floyd need only satisfy Fed. R. Civ. P. 8(a)(2)'s requirement that she give "fair notice" of her claims – which she has done – and that she is not required at the pleading stage to establish or prove the *prima facie* elements of her claims. The Amended Complaint includes many factual details supporting Floyd's claims, and gives more than fair notice to NYPR of those claims. Notably, with respect to some of Floyd's claims, NYPR's current lead lawyer even conducted an internal investigation into those claims, and thus NYPR is hard-pressed to explain how it does not have fair notice (or even sufficient facts) surrounding those claims. Further, despite acknowledging that, on a Rule 12(b)(6) motion, the Court *must* accept Floyd's factual allegations as true, NYPR takes great liberty in arguing those factual allegations and urging the Court to consider its version of the facts outside of the Amended Complaint, which conflict with or ignore the facts set forth in the Amended Complaint. Yet, in ruling on a motion to dismiss, the Court cannot consider or resolve disputed issues of fact. Only the jury at the trial can decide disputed facts.

Finally, with respect to its statute of limitations defense, NYPR wholly ignores that Floyd explicitly stated in her causes of action that she was only asserting claims *during the statute of*

*limitations periods*, which makes the motion futile. NYPR also ignores well-settled Supreme Court and Second Circuit case law holding that a district judge should deny a motion to dismiss a hostile work environment claim as untimely when the pleading alleges a continuing violation and includes facts to support such violation, which the Amended Complaint does here.

For these reasons and those below, the Court should deny NYPR's motion to dismiss.

## II.  <u>FACTUAL BACKGROUND</u>

The following facts in the Amended Complaint, which are deemed true for purposes of NYPR's motion, belie NYPR's contention that Floyd failed to plead facts to support her claims:

Floyd, who is Black, became an employee of NYPR in June 2015, as the local host for *All Things Considered* on WNYC. (Am. Compl., ¶¶ 1, 2.) Shortly after starting her employment with NYPR, however, Floyd faced a racially hostile work environment, where she was bullied, demeaned and undermined. (*Id*., ¶ 4.) This behavior continued throughout her employment, and amounted to a continuing violation of her rights under the anti-discrimination laws. (*Id*.) Despite being a talented, well-educated and smart Black woman with significantly more experience than most employees in the Newsroom at WNYC, it was made clear to Floyd that she was not respected, editorially trusted or admired. (*Id*.)

Throughout the years of her employment and during the applicable statute of limitations periods, Floyd complained repeatedly to senior leadership, Human Resources and the Board of Trustees about this hostility, but no corrective action was taken. (*Id*., ¶¶ 5, 31.) All the while, and despite her valiant effort to move her career forward, her career was derailed. (*Id*., ¶ 5.)  Indeed, like many employees of color at WNYC, Floyd was hazed by supervisors and, despite prior assurances, she was not given plum assignments, shows or time slots, and her editorial ideas were not supported and mostly disregarded. (*Id*.) As Floyd asserted herself, the work environment

became more hostile, with management and editors in the Newsroom sidelining her and preventing her from excelling at her job. (*Id.*) This created a racially and retaliatory hostile work environment for Floyd and was a continuing pattern and violation throughout her employment. (*Id.*)

With respect to Floyd's race discrimination claims in connection with the denial of promotion and advancement, the Amended Complaint includes the following specific factual allegations, among others:

7.      Between at least 2017 and 2021 and during the applicable statute of limitations periods, NYPR continually denied Floyd advancement to host shows that she was more than qualified to host – and for which she regularly filled in as the host, including, for example, *The Brian Lehrer Show*, *The Leonard Lopate Show*, *The Takeaway*.

41.      Floyd's request for an 'editor' title started in 2019, during Schachter's tenure, and continued with the Interim News Director and through to the hiring of a new Editor-in-Chief in June 2020. Despite the fact that Floyd had spent over a decade as WNYC's go-to legal analyst and de facto editor, WNYC still resisted giving her this title, which was because of her race and her complaints about race discrimination. At the same time, non-Black employees with far less journalism experience were given editor titles. Since the other editors did not have the expertise to edit legal stories, they routinely turned to Floyd to do so.

42.      After Floyd had complained to Human Resources in June 2019, the SAG-AFTRA union, and even the new CEO about this issue, WNYC finally gave her a "Legal Editor" title in August 2020.  Even then, there was no announcement of this title, or recognition of any kind, even though management regularly sent out notices to announce similar title changes and other achievements, which demonstrated to Floyd, yet again, that WNYC was treating her differently because of her race, given that NYPR-WNYC had publicly acknowledged non-Black employees for such title or role changes. Moreover, WNYC was not going to give Floyd any additional compensation for this role, until the union intervened. As a result, WNYC paid Floyd a paltry amount for this new title (based only on projected overtime which they asked her to calculate), despite her vast experience and contributions. Floyd believes that she was continually paid significantly less than non-Black hosts to whom she should have been compared over several years and through the end of her employment, and that discovery in this lawsuit will reveal this pay inequity.

43.      By 2020, [Executive Editor for News Sean] Bowditch was running the Newsroom as the Interim News Director and the work environment became worse as WNYC searched for Schachter's replacement. Floyd continued to strive to advance her career at WNYC, and had applied for the vacant role of Vice President,

News (Editor-in-Chief) in November 2019, after Schachter had been dismissed by WNYC and the role was open. Floyd was hopeful the new management, including Sheikholeslami and Golis, would be open to a more diverse C-Suite. Floyd was granted an interview for the role, and she used that interview as an opportunity to share her ideas for improving the Newsroom, especially around racial and gender diversity. As Sheikholeslami and Golis were conducting a listening tour in the Newsroom concerning who they should hire for the position, Newsroom staffers were vocal in their opinion that WNYC needed a person with broadcast news experience, a native New Yorker (or least someone who knew the market), and a person of color to fill the role.

44.     Nonetheless, in June 2020, WNYC selected Audrey Cooper to be the Editor-in-Chief, and not Floyd. This adverse action toward Floyd was because of her race and her complaints about discriminatory conduct at NYPR. Over 150 employees signed a petition opposing the hiring of Cooper. Notably, Floyd did not sign the petition despite being passed over, yet again, for a promotion, this time in favor of a less-qualified Caucasian, who had no knowledge of New York City and had no broadcast experience. Floyd is a native New Yorker and had two decades of broadcast news experience at that point in time. WNYC's failure to select Floyd or someone from the pool of other diverse candidates for this role is further evidence of racial bias.

46.     WNYC's decision to interview Floyd for the Editor-in-Chief role was part of a sham process, as Golis had previously worked in the Bay Area where Cooper also was from and, upon information and belief, had a preference to hire Cooper from the start. Floyd has no doubt that WNYC's decision to interview her was made to check a box that WNYC had interviewed a "diverse" candidate, similar to the "Rooney Rule" in the National Football League. A review of WNYC management over the past several years reinforces this belief, demonstrating a lack of representation of Black people in senior content leadership roles. At the same time, there was no lack of talented Black candidates, including Floyd, who was instead "promoted" in September 2020, in the wake of George Floyd's murder, to run a Race & Justice Unit that purported to cover communities of color.

47.     Once Cooper joined leadership in 2020, she demonstrated her own strange brand of racial hostility, or insensitivity at best. For example, in her first meeting with Floyd, she said that WNYC was going to shutter the "Radio Rookies" program, a beloved, two decades-old program which gave Black and brown high school students the tools to tell radio stories about their under-represented communities. Floyd eventually persuaded Cooper to keep the program, as Cooper could not articulate a good reason for eliminating it, but Cooper then directed Floyd to manage the program. Cooper also demonstrated racial hostility toward employees of color, by making comments that smacked of racism and suggesting that South Asians were laconic and lazy (*e.g.*, repeatedly demeaning one employee of color for having "low metabolism" and another for "just not getting what we do here"). Cooper also told Floyd that she did not value these and other reporters, and

4

then assigned those reporters to Floyd's team, thereby messaging to Floyd the low esteem in which she held the Race & Justice Unit and creating what employees perceived to be a "reporting ghetto,"  sending a clear signal that the Race & Justice Unit was a dumping ground for purportedly failing reporters of color who were deemed problematic and not respected by management. By the end of 2021, all but one of the reporters who worked under Floyd in the Race & Justice Unit had been pushed out by Cooper or had left WNYC, leaving Floyd with a single reporter and further signifying to Floyd and her colleagues that the Race & Justice Unit was not a meaningful part of the Newsroom. This also demonstrated to Floyd that she continued to be the victim of race discrimination and retaliation, given that NYPR was not providing her with the support it provided to non-Black employees or employees who had not complained about discrimination in the workplace.

48.     Cooper and senior leaders simply did not support the Race & Justice Unit and did not intend for that Unit to thrive. While WNYC sought to spin Floyd's move to the Unit in September 2020 as a promotion, it was anything but. That move took Floyd off air to assume responsibility for a desk with no budget or authority to hire staff, and she also made less in annual compensation in 2020 and even less in 2021, when compared to her compensation in 2018 or 2019. Once again, this demonstrated to Floyd that that she was a victim of race discrimination and retaliation, given that NYPR was not providing her with the support or compensation it provided to non-Black employees or employees who had not complained about discrimination in the workplace.

49.     Despite promises that Floyd could hire diverse reporters for the Race & Justice Unit, none were ever authorized – even though Floyd presented many qualified candidates. This lack of support for Floyd and the Unit was because of Floyd's race and in retaliation for her complaints about discrimination. For instance, in June 2021, Floyd recommended hiring a multilingual Arab-American journalist with a degree from Columbia University's Graduate School of Journalism. Cooper told Floyd that she could not hire this journalist "because he is not Black." Floyd was shocked at the comment and reported this to WNYC's Chief Human Resources Officer, Monique Jefferson, and Freed, but nothing happened. At the same time, when Floyd fought to hire many qualified Black reporters, WNYC refused to approve those hires. Simply put, WNYC viewed the Race & Justice Unit as window dressing to make WNYC look good from a racial standpoint in the wake of George Floyd's murder and thereafter, which also had the added benefit for management of removing Floyd from working on air.

51.     In 2021, Floyd continued to endure WNYC's disregard for her and other Black talent. For instance, WNYC turned a blind eye to fellow editor Jen Chung's disclosure of confidential information to media outlets concerning Floyd, as WNYC management did nothing to stop Chung or correct the clear misinformation that was being reported about Floyd. When the *New York Times* incorrectly reported its story in November 2021 about articles under Floyd's name, WNYC's management admitted to Floyd that the *New York Times* article contained factual

errors about Floyd and WNYC, but said WNYC would not be seeking a correction. Floyd lodged a formal complaint with Jefferson about Chung's behavior. Despite Jefferson's assurances that appropriate action would be taken, WNYC's management condoned and acquiesced in Chung's wrongful conduct, which, upon information and belief, was directly related to work of the Race & Justice Unit and therefore race-based. This conduct significantly damaged Floyd's reputation in the industry. WNYC's failure to take steps to stop Chung's wrongful and unlawful race-based behavior makes WNYC complicit in that conduct. Floyd also believes that WNYC did not take steps to curtail or end Chung's misconduct because it was retaliating against Floyd for her continued complaints of race discrimination.

(Am. Compl., ¶¶ 7, 41-44, 46-49, 51; *see also id*., ¶¶ 28-34.)

In the Amended Complaint, Floyd also alleges that she was paid less than others because of her race and prior complaints of discriminatory treatment. Floyd alleges that, during the applicable statute of limitations periods, she earned between approximately $160,000 and $176,000 for hosting *All Things Considered* on the air for 4 hours per day (plus pre-tape time) – among other duties, including, for example, reporting from the field, serving as the legal analyst supporting all WNYC's programming and representing NYPR at off-site fundraising events – and yet was making about the same or less than staff who supported the *Brian Lehrer Show*. (Am. Compl., ¶ 32.) During her employment and within the applicable statute of limitations periods, Floyd also was paid considerably less than Caucasian talk show hosts – some of whom she filled in for – even though she was at least equally as qualified as them, if not more qualified, and she performed under similar working conditions or at least performed substantially similar work than these hosts – and often times performed more work than others. (*Id*., ¶¶ 7, 32.) When Floyd moved to the Race & Justice Unit in 2020, her compensation for 2020 and 2021 was lower than it was in 2018 or 2019, which also supports her claim that it was not a "promotion." (*Id*., ¶ 48.)

With respect to Floyd's hostile work environment claims and the continuous pattern of such conduct throughout the years, the Amended Complaint includes the following factual allegations:

6

4.      Shortly after starting her employment with NYPR, however, Floyd faced a racially hostile work environment, where she was bullied, demeaned and undermined. This behavior continued throughout her employment, and amounted to a continuing violation of her rights under the anti-discrimination laws. Despite being a talented, well-educated and smart Black woman with significantly more experience than most employees in the Newsroom at WNYC, it was made clear to Floyd that she was not respected, editorially trusted or admired.

5.      Throughout the years of her employment and during the applicable statute of limitations periods, Floyd complained repeatedly to senior leadership, Human Resources and the Board of Trustees about this hostility, but no corrective action was taken. All the while, and despite her valiant effort to move her career forward, her career was derailed. Indeed, like many employees of color at WNYC, Floyd was hazed by supervisors and, despite prior assurances, was not given plum assignments, shows or time slots, and her editorial ideas were not supported and mostly disregarded. As Floyd asserted herself, the work environment became more hostile, with management and editors in the Newsroom sidelining her and preventing her from excelling at her job. This created a racially and retaliatory hostile work environment for Floyd and was a continuing pattern and violation throughout her employment. At the same time, management responsible for show development led Floyd to believe that WNYC had plans to elevate her to the daytime host slot as soon as it became available.

21.     Shortly after starting her employment with WNYC, however, Floyd began facing a racially hostile work environment, where she was bullied, demeaned, and undermined. Despite being a talented and smart Black woman, with 20+ years of experience in the news industry – more than her two direct supervisors and most other journalists in the Newsroom – it was made clear to Floyd that she was not respected, editorially trusted, or admired. Throughout the years of her employment, Floyd complained repeatedly to NYPR senior leadership and Human Resources. She even brought her concerns about this hostility to the Board of Trustees, including to Executive Committee member Jonelle Procope, who is African-American, but no action was taken. All the while, Floyd's career was derailed. Indeed, like many employees of color at WNYC, Floyd was hazed by supervisors, and despite prior assurances, she was denied the opportunity to advance or receive plum assignments, and her editorial ideas were not supported and were mostly disregarded.

22.     As Floyd asserted herself, the work environment became more hostile, with management and editors in the Newsroom sidelining her and preventing her from excelling at her job. This created a retaliatory hostile work environment for Floyd and was a continuing pattern and violation throughout her employment. At the same time, management asked Floyd, as a prominent Black talent at WNYC, to support her black colleagues who were struggling in a culture that did not support them. Floyd routinely met with Black staff in her studio and off campus to talk about their trials and tribulations at NYPR. As the only Black on-air news host, and a woman,

she was held out as a leader on issues of race and gender, a role she responsibly fulfilled, despite the toll it took on her time, energy and spirits.

25.     In 2017, it was revealed that several male hosts at NYPR had engaged in sexual harassment. Floyd was one of many women who complained about the sexually-charged work environment at WNYC.

26.     In 2017, Schachter sought to terminate Floyd's employment after she complained about fellow host John Hockenberry's sexual harassment of staff, along with other problems in the Newsroom.  Floyd survived Schachter's retaliatory conduct at that point, but her work environment became more hostile and challenging as a result.

28.     On the day that WNYC suspended Lopate in December 2017, Schachter and Cappello promised Floyd in conversations, which they followed up in emails, to elevate her to take over Lopate's midday show. The promises from Cappello and Schachter were designed to keep Floyd, the only Black host at WNYC, during a time of bleak public relations around race and gender, as well as keep her silent about the real problems she witnessed behind the scenes. But, Schachter and Cappello did not follow through with those promises, and that was because of her race and prior complaints about discriminatory and harassing conduct. As Floyd would later realize, this was just the beginning of NYPR's continuous pattern of race discrimination and retaliation against her and was consistent with the pattern of mistreatment of other Black employees over the years.

29.     In July 2018, Schachter announced he would be forming a committee to design a new midday show, thereby publicly humiliating Floyd by denying her the host-chair in the time slot previously occupied by Lopate and forcing her to audition for a role she long ago had been promised. While Floyd had been promised that job in December 2017, she went along with the midday audition process in the belief that, after one final step, the promise would be honored in the end. By this point, Cappello had been pushed out of WNYC in the wake of allegations of sexual harassment against top hosts at WNYC and, upon information and belief, concerns about his own inappropriate conduct.

30.     On July 16, 2018, Schachter called Floyd to a meeting and, when she showed up, Chief Human Resources Officer Dana Teplitsky and Executive Editor for News Sean Bowditch were present. Floyd was concerned with Teplitsky's presence at the meeting, and she asked if she was "being fired." Schachter told her that she was not being fired, but that she was not getting the midday timeslot, and he "wanted witnesses" present for that news. In Floyd's experience, it was unusual for Schachter to have Human Resources present for a meeting. Teplitsky's presence suggested to Floyd that something was awry, because, had this been an ordinary selection process, Teplitsky would not have been present to deliver this news. Floyd has no doubt that she was denied this long-awaited and promised opportunity to host because of her race and her advocacy on behalf of victims of Hockenberry and

8

Lopate, her constant questions about diversity and inclusion at WNYC, and her refusal to kowtow to the mostly male and all-white editor pool in the Newsroom, instead standing up for editorial empowerment on *All Things Considered*.

34.     Despite not getting the long-anticipated midday slot, Floyd continued during the applicable statute of limitations periods to present ideas in the Newsroom about programming that focused on race and gender-related issues – including opportunities to interview leading civil rights activists, high-profile politicians, and women of prominence to whom she had access. She suggested alternative program ideas – some of which were picked up at other stations after WNYC ignored them or shot them down. Despite Floyd's tireless efforts, however, Schachter, his successors and the Newsroom continued to give Floyd little support.

35.     Until the day Schachter was forced to leave WNYC in 2019, he continued to display his open hostility toward the advancement of Black employees, stating in 2018 with the arrival of Depelsha McGruder that "now we have a black COO. What's next, a Black president?" Schachter also made other racially hostile comments over the years, including one he made just before a NY Association of Black Journalists event, when he said that he could not compete sartorially with all the Black people in the room since, in his view, Black people always would out-dress him.  These are just some examples.

36.     Racial insensitivity was part of the culture at WNYC. In May 2019, WNYC instituted its infamous "n-word" policy to manage the use of the n-word on its airwaves.  From the start, WNYC pulled Floyd, as its token Black news talent, into this conversation, which was draining for her and demeaning. WNYC set up an emergency editorial committee to navigate the use of the word on-air at all hours of the day and night. It came to be called the "Black Editorial Committee," to the chagrin of Black employees, including Floyd. Serving on the Committee was taxing and exploitative for Floyd, requiring significant time and emotional energy, with no extra compensation. WNYC simply used Floyd for the color of her skin. Other Black employees felt similarly abused.

39.     Throughout her employment and during the applicable statute of limitations periods, Floyd continued to be bullied and harassed, including by Program Director Jacqueline Cincotta and Supervising Senior Producer Richard Yeh, which created on-going challenges for her in the Newsroom and prevented her from performing her job duties. This race-based conduct included, but was not limited to, verbal bullying, a reporting structure different from other similarly-situated, non-Black hosts, and denial of an editor title that was granted to similarly-situated and far less experienced, non-Black employees. This pattern of unlawful conduct was designed to make Floyd feel uncomfortable and unwelcomed, and it did. This conduct also directly and negatively impacted Floyd's ability to perform her duties, her productivity, her job satisfaction and her emotional well-being during the applicable statute of limitations periods.

40.    On June 24, 2019, Floyd lodged a complaint with the Human Resources Business Partner for News, Rebecca Shapiro, about the abuse from Cincotta. Yet, no action was ever taken by Shapiro or WNYC. Floyd also had put CEO Laura Walker and Schachter on notice about Cincotta before their departures in 2019, but they also failed to take any corrective action. Floyd had made similar complaints on November 28, 2018, to WNYC's outside consultant, Equitable, but no action was taken in response to her complaints at that point, either. Thus, it was clear to Floyd that WNYC condoned this unlawful conduct by Cincotta, which was well-known throughout the building.

(Am. Compl., ¶¶ 4-5, 21-22, 25-26, 28-30, 34-36, 39-40; *see also id.*, ¶¶ 41-43.)

With respect to Floyd's retaliation claims, the Amended Complaint includes the following factual allegations:

5.    Throughout the years of her employment and during the applicable statute of limitations periods, Floyd complained repeatedly to senior leadership, Human Resources and the Board of Trustees about this hostility, but no corrective action was taken. All the while, and despite her valiant effort to move her career forward, her career was derailed. Indeed, like many employees of color at WNYC, Floyd was hazed by supervisors and, despite prior assurances, was not given plum assignments, shows or time slots, and her editorial ideas were not supported and mostly disregarded. As Floyd asserted herself, the work environment became more hostile, with management and editors in the Newsroom sidelining her and preventing her from excelling at her job. This created a racially and retaliatory hostile work environment for Floyd and was a continuing pattern and violation throughout her employment. At the same time, management responsible for show development led Floyd to believe that WNYC had plans to elevate her to the daytime host slot as soon as it became available.

7.    Between at least 2017 and 2021 and during the applicable statute of limitations periods, NYPR continually denied Floyd advancement to host shows that she was more than qualified to host – and for which she regularly filled in as the host, including, for example, *The Brian Lehrer Show*, *The Leonard Lopate Show*, *The Takeaway*.

21.    Shortly after starting her employment with WNYC, however, Floyd began facing a racially hostile work environment, where she was bullied, demeaned, and undermined. Despite being a talented and smart Black woman, with 20+ years of experience in the news industry – more than her two direct supervisors and most other journalists in the Newsroom – it was made clear to Floyd that she was not respected, editorially trusted, or admired. Throughout the years of her employment, Floyd complained repeatedly to NYPR senior leadership and Human Resources. She even brought her concerns about this hostility to the Board of Trustees, including to Executive Committee member Jonelle Procope, who is African-

American, but no action was taken. All the while, Floyd's career was derailed. Indeed, like many employees of color at WNYC, Floyd was hazed by supervisors, and despite prior assurances, she was denied the opportunity to advance or receive plum assignments, and her editorial ideas were not supported and were mostly disregarded.

25.    In 2017, it was revealed that several male hosts at NYPR had engaged in sexual harassment. Floyd was one of many women who complained about the sexually-charged work environment at WNYC.

26.    In 2017, Schachter sought to terminate Floyd's employment after she complained about fellow host John Hockenberry's sexual harassment of staff, along with other problems in the Newsroom. Floyd survived Schachter's retaliatory conduct at that point, but her work environment became more hostile and challenging as a result.

28.    On the day that WNYC suspended Lopate in December 2017, Schachter and Cappello promised Floyd in conversations, which they followed up in emails, to elevate her to take over Lopate's midday show. The promises from Cappello and Schachter were designed to keep Floyd, the only Black host at WNYC, during a time of bleak public relations around race and gender, as well as keep her silent about the real problems she witnessed behind the scenes. But, Schachter and Cappello did not follow through with those promises, and that was because of her race and prior complaints about discriminatory and harassing conduct. As Floyd would later realize, this was just the beginning of NYPR's continuous pattern of race discrimination and retaliation against her and was consistent with the pattern of mistreatment of other Black employees over the years.

30.    On July 16, 2018, Schachter called Floyd to a meeting and, when she showed up, Chief Human Resources Officer Dana Teplitsky and Executive Editor for News Sean Bowditch were present. Floyd was concerned with Teplitsky's presence at the meeting, and she asked if she was "being fired." Schachter told her that she was not being fired, but that she was not getting the midday timeslot, and he "wanted witnesses" present for that news. In Floyd's experience, it was unusual for Schachter to have Human Resources present for a meeting. Teplitsky's presence suggested to Floyd that something was awry, because, had this been an ordinary selection process, Teplitsky would not have been present to deliver this news. Floyd has no doubt that she was denied this long-awaited and promised opportunity to host because of her race and her advocacy on behalf of victims of Hockenberry and Lopate, her constant questions about diversity and inclusion at WNYC, and her refusal to kowtow to the mostly male and all-white editor pool in the Newsroom, instead standing up for editorial empowerment on *All Things Considered*.

31.    Within an hour after that July 2018 meeting, Floyd met with then-President Laura Walker, making it clear that she was disappointed with the midday host decision, and saying the process was discriminatory. Floyd also detailed the racially

discriminatory treatment she had endured and noted that there was a great imbalance around compensation at WNYC based on race. Floyd specifically told Walker that, as a Black woman, she felt "devalued," noting that she did not have an office, staff or other appropriate support for a show as demanding as *All Things Considered*, while her Caucasian male counterparts on less demanding shows had large staffs and budgets. Shortly thereafter, Floyd also had a conversation with NYPR's Deputy General Counsel, Janna Freed, about her complaints of discrimination, which was the first of several such conversations with Freed about discriminatory treatment. Floyd also spoke with Board Trustee Jonelle Procope about these concerns.

34.     Despite not getting the long-anticipated midday slot, Floyd continued during the applicable statute of limitations periods to present ideas in the Newsroom about programming that focused on race and gender-related issues – including opportunities to interview leading civil rights activists, high-profile politicians, and women of prominence to whom she had access. She suggested alternative program ideas – some of which were picked up at other stations after WNYC ignored them or shot them down. Despite Floyd's tireless efforts, however, Schachter, his successors and the Newsroom continued to give Floyd little support.

38.     Given that Sheikholeslami and Golis ignored Floyd's requests for a meeting about Newsroom culture, starting in the winter of 2019, Floyd had meetings with Leah Johnson, then a new member of the Board of Trustees and an African-American. During her meetings with Johnson, Floyd expressed great concern about the work culture, environment and mistreatment of Black employees at WNYC. Floyd even arranged for Johnson to meet off-site with eight Black employees in early-June 2019 – seven of whom later left WNYC, at least in part because of challenges they faced as Black employees. These Black employees recounted to Johnson their negative experiences as Black employees at WNYC. Those meetings put the Board on notice about the continuing hostile work environment for Black employees, including the lack of support for their work and ideas and the headwinds they faced as employees at WNYC. Even then, no corrective action was taken, which sent the message to Floyd and her fellow Black employees that NYPR condoned this race-based conduct.

39.     Throughout her employment and during the applicable statute of limitations periods, Floyd continued to be bullied and harassed, including by Program Director Jacqueline Cincotta and Supervising Senior Producer Richard Yeh, which created on-going challenges for her in the Newsroom and prevented her from performing her job duties. This race-based conduct included, but was not limited to, verbal bullying, a reporting structure different from other similarly-situated, non-Black hosts, and denial of an editor title that was granted to similarly-situated and far less experienced, non-Black employees. This pattern of unlawful conduct was designed to make Floyd feel uncomfortable and unwelcomed, and it did. This conduct also directly and negatively impacted Floyd's ability to perform her duties, her

productivity, her job satisfaction and her emotional well-being during the applicable statute of limitations periods.

40.     On June 24, 2019, Floyd lodged a complaint with the Human Resources Business Partner for News, Rebecca Shapiro, about the abuse from Cincotta. Yet, no action was ever taken by Shapiro or WNYC. Floyd also had put CEO Laura Walker and Schachter on notice about Cincotta before their departures in 2019, but they also failed to take any corrective action. Floyd had made similar complaints on November 28, 2018, to WNYC's outside consultant, Equitable, but no action was taken in response to her complaints at that point, either. Thus, it was clear to Floyd that WNYC condoned this unlawful conduct by Cincotta, which was well-known throughout the building.

41.     Floyd's request for an "editor" title started in 2019, during Schachter's tenure, and continued with the Interim News Director and through the hiring of a new Editor-in-Chief in June 2020. Despite the fact that Floyd had spent over a decade as WNYC's go-to legal analyst and *de facto* editor, WNYC still resisted giving her this title, which was because of her race and her complaints about race discrimination. At the same time, non-Black employees with far less journalism experience were given editor titles. Since the other editors did not have the expertise to edit legal stories, they routinely turned to Floyd to do so.

42.     After Floyd had complained to Human Resources in June 2019, the SAG-AFTRA union, and even the new CEO about this issue, WNYC finally gave her a "Legal Editor" title in August 2020.  Even then, there was no announcement of this title, or recognition of any kind, even though management regularly sent out notices to announce similar title changes and other achievements, which demonstrated to Floyd, yet again, that WNYC was treating her differently because of her race, given that NYPR-WNYC had publicly acknowledged non-Black employees for such title or role changes. Moreover, WNYC was not going to give Floyd any additional compensation for this role, until the union intervened. As a result, WNYC paid Floyd a paltry amount for this new title (based only on projected overtime which they asked her to calculate), despite her vast experience and contributions. Floyd believes that she was continually paid significantly less than non-Black hosts to whom she should have been compared over several years and through the end of her employment, and that discovery in this lawsuit will reveal this pay inequity.

47.     Once Cooper joined leadership in 2020, she demonstrated her own strange brand of racial hostility, or insensitivity at best. For example, in her first meeting with Floyd, she said that WNYC was going to shutter the "Radio Rookies" program, a beloved, two decades-old program which gave Black and brown high school students the tools to tell radio stories about their under-represented communities. Floyd eventually persuaded Cooper to keep the program, as Cooper could not articulate a good reason for eliminating it, but Cooper then directed Floyd to manage the program. Cooper also demonstrated racial hostility toward employees of color, by making comments that smacked of racism and suggesting

that South Asians were laconic and lazy (*e.g.*, repeatedly demeaning one employee of color for having "low metabolism" and another for "just not getting what we do here"). Cooper also told Floyd that she did not value these and other reporters, and then assigned those reporters to Floyd's team, thereby messaging to Floyd the low esteem in which she held the Race & Justice Unit and creating what employees perceived to be a "reporting ghetto," sending a clear signal that the Race & Justice Unit was a dumping ground for purportedly failing reporters of color who were deemed problematic and not respected by management. By the end of 2021, all but one of the reporters who worked under Floyd in the Race & Justice Unit had been pushed out by Cooper or had left WNYC, leaving Floyd with a single reporter and further signifying to Floyd and her colleagues that the Race & Justice Unit was not a meaningful part of the Newsroom. This also demonstrated to Floyd that she continued to be the victim of race discrimination and retaliation, given that NYPR was not providing her with the support it provided to non-Black employees or employees who had not complained about discrimination in the workplace.

48.     Cooper and senior leaders simply did not support the Race & Justice Unit and did not intend for that Unit to thrive. While WNYC sought to spin Floyd's move to the Unit in September 2020 as a promotion, it was anything but. That move took Floyd off air to assume responsibility for a desk with no budget or authority to hire staff, and she also made less in annual compensation in 2020 and even less in 2021, when compared to her compensation in 2018 or 2019. Once again, this demonstrated to Floyd that that she was a victim of race discrimination and retaliation, given that NYPR was not providing her with the support or compensation it provided to non-Black employees or employees who had not complained about discrimination in the workplace.

49.     Despite promises that Floyd could hire diverse reporters for the Race & Justice Unit, none were ever authorized – even though Floyd presented many qualified candidates. This lack of support for Floyd and the Unit was because of Floyd's race and in retaliation for her complaints about discrimination. For instance, in June 2021, Floyd recommended hiring a multilingual Arab-American journalist with a degree from Columbia University's Graduate School of Journalism. Cooper told Floyd that she could not hire this journalist "because he is not Black." Floyd was shocked at the comment and reported this to WNYC's Chief Human Resources Officer, Monique Jefferson, and Freed, but nothing happened. At the same time, when Floyd fought to hire many qualified Black reporters, WNYC refused to approve those hires. Simply put, WNYC viewed the Race & Justice Unit as window dressing to make WNYC look good from a racial standpoint in the wake of George Floyd's murder and thereafter, which also had the added benefit for management of removing Floyd from working on air.

51.     In 2021, Floyd continued to endure WNYC's disregard for her and other Black talent. For instance, WNYC turned a blind eye to fellow editor Jen Chung's disclosure of confidential information to media outlets concerning Floyd, as WNYC management did nothing to stop Chung or correct the clear misinformation

that was being reported about Floyd. When the *New York Times* incorrectly reported its story in November 2021 about articles under Floyd's name, WNYC's management admitted to Floyd that the *New York Times* article contained factual errors about Floyd and WNYC, but said WNYC would not be seeking a correction. Floyd lodged a formal complaint with Jefferson about Chung's behavior. Despite Jefferson's assurances that appropriate action would be taken, WNYC's management condoned and acquiesced in Chung's wrongful conduct, which, upon information and belief, was directly related to work of the Race & Justice Unit and therefore race-based. This conduct significantly damaged Floyd's reputation in the industry. WNYC's failure to take steps to stop Chung's wrongful and unlawful race-based behavior makes WNYC complicit in that conduct. Floyd also believes that WNYC did not take steps to curtail or end Chung's misconduct because it was retaliating against Floyd for her continued complaints of race discrimination.

53.     Despite Floyd's repeated and good-faith complaints about race discrimination over the years, NYPR wholly ignored the law and its own anti-discrimination and anti-retaliation polices. Even though NYPR maintained that it will investigate claims of discrimination and retaliation, Floyd does not believe that NYPR appropriately investigated the complaints of discrimination and retaliation that she made during her employment, given that she saw no corrective action. NYPR played lip service to those hollow policies and its commitment to employees that discrimination and retaliation is not tolerated at NYPR.

(Am. Compl., ¶¶ 5, 7, 21, 25, 26, 28, 30, 31, 34, 38, 39, 40, 41, 42, 47, 48, 49, 51, 53.) Floyd's complaints led NYPR to conducting workplace investigations, including one by the law firm representing NYPR in this case, and those attorneys possess facts about Floyd's claims and most likely have additional facts that Floyd will obtain during discovery. (*Id.*, ¶¶ 32-33.)

In short, the Amended Complaint provides sufficient facts and gives fair notice to NYPR that it deprived Floyd of advancement and promotion, gave her lower compensation than comparators, retaliated against her, and subjected her to a racially and retaliatory hostile environment, in violation of Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), the New York State Human Rights Law ("SHRL"), and the New York City Human Rights Law ("CHRL"); and that it engaged in race-based pay discrimination in violation of New York Labor Law ("NYLL") § 194.

## III. <u>ARGUMENT</u>

### A.   THE COURT MUST ACCEPT FLOYD'S ALLEGATIONS AS TRUE AND CANNOT RESOLVE FACTUAL DISPUTES AT THIS STAGE

"Any Rule 12(b)(6) movant for dismissal faces a difficult … hurdle." *Harris v. City of N.Y.*, 186 F.3d 243, 248 (2d Cir. 1999). That is because, in ruling on a Rule 12(b)(6) motion, the Court must "accept as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them," and view them "in the light most favorable" to the plaintiff. *Koch v. Christie's Int'l Pub. Ltd. Co.*, 699 F.3d 141, 145 (2d Cir. 2012). The Court "should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of h[er] claim which would entitle h[er] to relief." *Harris*, 186 F.3d at 248. Indeed, the Amended Complaint need only include sufficient facts to show that the legal claims are "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

Even then, the plaintiff need only satisfy Fed. R. Civ. P. 8(a)(2)'s requirement to include "a short and plain statement of the claim showing that the pleader is entitled to relief" sufficient to give the defendant fair notice of the claim and the grounds upon which it rests. *E.g.*, *Boykin v. Key Corp.*, 521 F.3d 202, 213-14 (2d Cir. 2008) (noting that *Twombly* "affirmed the vitality of *Swierkiewicz* [*v. Sorema N.A.*, 534 U.S. 506, 510 (2002)], which applied a notice pleading standard, and explained that its decision did not 'require heightened fact pleading of specifics'" – rather, the plaintiff need only give defendant "fair notice of her claim and the grounds upon which it rests"); *Gillman v. Inner City Broad. Corp.*, 2009 U.S. Dist. LEXIS 85479, at *11 (S.D.N.Y. 2009) ("*Iqbal* was not meant to displace *Swierkiewicz*'s teachings about pleading standards for employment discrimination claims because in *Twombly*, which heavily informed *Iqbal*, the Supreme Court

explicitly affirmed the vitality of *Swierkiewicz*."); *Tejada v. Mance*, 2008 U.S. Dist. LEXIS 85566, at *12 (N.D.N.Y. 2008) (only notice pleading is required). More significantly, despite NYPR's efforts to inject new purported facts outside of the Amended Complaint, it is well settled that the Court cannot resolve factual disputes on a motion to dismiss. *E.g.*, *DiBlasio v. Novello*, 344 F.3d 292, 304 (2d Cir. 2003) (holding that a "disputed issue of fact… is inappropriate to consider in the context of a Rule 12(b)(6) motion"). Applying these standards here, the Court should deny NYPR's motion in its entirety and permit discovery on all of the claims in the Amended Complaint.

## B.  FLOYD HAS PROPERLY PLED DENIAL OF ADVANCEMENT AND PROMOTION, DISCRIMINATORY PAY PRACTICE, HOSTILE ENVIRONMENT AND RETALIATION CLAIMS

In its motion, NYPR argues that Floyd has not pled the elements of her *prima facie* case of race discrimination in connection with her claims for failure to advance or promote her, discriminatory pay practices, retaliation and hostile work environment. **(**Def.'s Mem. at 13-24.) In doing so, NYPR ignores well-settled Supreme Court and Second Circuit law holding that a plaintiff in an employment discrimination, retaliation or hostile environment case is *not required* to plead the elements of a *prima facie* case to withstand a motion to dismiss, but only has to satisfy Rule 8(a)(2)'s requirement to give the defendant "fair notice" of her claims. *Boykin,* 521 F.3d at 213-14; *Gillman*, 2009 U.S. Dist. LEXIS 85479, at *12-13. Because Floyd has clearly given NYPR fair notice of her claims, the Court should deny the motion to dismiss. *E.g.*, *Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, 2022 U.S. Dist. LEXIS 31075, at *13-14 (S.D.N.Y 2022) (denying Rule 12(b)(6) motion to dismiss discrimination, hostile work environment and retaliation claims, stating that Rule 12(b)(6) "'does not impose a probability requirement at the pleading

stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the truth of the allegations'").[1]

### 1. Floyd Has Given Fair Notice Of Her Claims For Discriminatory Failure To Advance Or Promote Her

One of Floyd's primary claims in this case involves NYPR's denial of her advancement and promotion over the years. (Am. Compl., ¶ 8.) Contrary to NYPR's contentions, the Amended Complaint includes sufficient factual detail as to these claims to give NYPR fair notice of those claims and survive the motion to dismiss. (*See*, *e.g.*, *id.*, ¶¶ 7, 32, 35, 39, 40-43, 45-51.) Specifically, the Amended Complaint makes clear that, "[b]etween at least 2017 and 2021 and during the applicable statute of limitations periods, NYPR continually denied Floyd advancement to host shows that she was more than qualified to host – and for which she regularly filled in as the host, including, for example, *The Brian Lehrer Show, The Leonard Lopate Show, The Takeaway* – and deprived her of just compensation and paid her less than non-Black hosts to whom she should have been compared because of her race and prior complaints about discriminatory treatment." (*Id.*, ¶ 7.) The Amended Complaint also provides factual detail as to the denial of Floyd's advancement or promotion, making clear that she suffered adverse employment actions during the limitation periods applicable to her claims, including, for example, paragraphs 41, 43 through 49 and 51. (*Id.*, ¶¶ 41, 43-49, 51.) All of these facts, and many others in the Amended Complaint, clearly give fair notice to NYPR of Floyd's claims of failure to advance or promote her because of her race, and thus easily satisfy Rule 8(a)(2)'s requirements and Supreme Court and Second Circuit precedent. Therefore, the Court should deny NYPR's motion to dismiss Floyd's race

---

[1]      In any event, the Amended Complaint shows that Floyd has in fact alleged a *prima facie* case of discrimination, retaliation and hostile work environment.

discrimination claims with respect to the denial of her advancement and promotion in the First, Fourth and Seventh Causes of Action.

## 2. **Floyd Has Given Fair Notice Of Her Pay Discrimination Claims**

In its motion, NYPR argues that Floyd has not pled facts to support her discriminatory pay practice claims under the NYLL, § 1981, the SHRL or the CHRL. (Def.'s Mem. at 24.)  NYPR is wrong. For instance, the Amended Complaint specifically states in paragraph 32 that, "during the applicable statute of limitations periods, Floyd was earning between approximately $160,000 and $176,000 for hosting *All Things Considered* on the air for 4 hours per day (plus pre-tape time) – among other duties, including, for example, reporting from the field, serving as the legal analyst supporting all WNYC's programming and representing NYPR at off-site fundraising events – and yet was making about the same or less than staff who supported the *Brian Lehrer Show*." (Am. Compl., ¶ 32.) Moreover, Floyd identifies her comparators; she alleges that she was paid less than *other talk show hosts* who she believes are her comparators: "Floyd also was paid considerably less than Caucasian *talk show hosts – some of whom she filled in for –* even though she was at least equally as qualified as them, if not more qualified, and she performed under similar working conditions or at least performed substantially similar work than these hosts – and often times performed more work than others." (*Id.*; *see also id.*, ¶ 7) (emphasis added). And, after her purported promotion to the Race & Justice Unit in 2020, Floyd's compensation decreased, which further shows that it was anything but a "promotion." (*Id.*, ¶ 48.) Floyd also maintains that NYPR has facts exclusively within its possession concerning the compensation paid to other employees with whom she compares herself, (*id.*, ¶¶ 32, 42), and thus, discovery is needed as to the compensation paid to those comparators.

NYPR seeks to inject facts as to who was "similarly-situated" to Floyd for purposes of her pay discrimination claims. (Def.'s Mem. at 24.) But, that inquiry is premature: whether a co-employee is "similarly-situated" to Floyd for purposes of her claims *is a question of fact* that must await the completion of discovery, and thus cannot be resolved on a motion to dismiss. *See*, *e.g.*, *Graham v. Long Island R.R.*, 230 F.3d 34, 39-40 (2d Cir. 2000) (recognizing that the inquiry as to similarly-situated employees is fact-intensive); *see Edelman v. NYU Langone Health Sys.*, 2022 U.S. Dist. LEXIS 176681, at *45-47 (S.D.N.Y. 2022) (analysis of pay discrimination with respect to comparators is fact-based inquiry; court denied summary judgment because of issues of fact); *DiBlasio*, 344 F.3d at 304 (holding that a "disputed issue of fact… is inappropriate to consider in the context of a Rule 12(b)(6) motion"). Because Floyd has given fair notice to NYPR of her pay discrimination claims, and the question of similarly-situated employees is a factual question for which discovery is necessary (particularly given that NYPR has exclusive possession of pay data for employees), the Court should deny NYPR's motion as to the discriminatory pay claims in the First, Fourth, Seventh and Tenth Causes of Action in the Amended Complaint.

### 3. <u>Floyd Has Given Fair Notice Of Her Hostile Work Environment Claims</u>

In its motion, NYPR argues that Floyd has not met the "severe" or "pervasive" standard for establishing hostile environment claims under §1981 and the SHRL, claiming that the Amended Complaint "contains no facts." (Def.'s Mem. at 13-15.) NYPR's arguments are unavailing.

As an initial matter, NYPR ignores the legal standards for hostile environment claims under the CHRL and SHRL. Under the CHRL and SHRL there is no "severe or pervasive" element for a hostile environment claim – that is a defense and factor to consider on the issue of damages. *Mondelo*, 2022 U.S. Dist. LEXIS 31075, at * 26-27. Moreover, for these hostile environment

claims, Floyd need only allege that she was "treated less well than other employees" because of her race or protected activity. *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't), *lv denied* 13 N.Y.3d 702 (2009). In addition, once again, NYPR seeks to argue facts and ignore the allegations in paragraphs 4-5, 21-22, 25-26, 28-30, 34-36 and 39-43 of the Amended Complaint, as quoted on pages 7-10 above. These detailed allegations give NYPR fair notice of Floyd's hostile environment claims under Rule 8(a)(2), as they make clear that there was a continuing pattern of disparate treatment extending over a period of years, including, for example, by depriving Floyd of advancement or promotion, failing to give her a title, failing to support her and making her job harder, treating her differently than others because of race and because she engaged in protected activity, and denying her compensation. Consequently, these allegations are sufficient to survive a motion to dismiss. *Santiago v. Acacia Network, Inc.*, 634 F. Supp. 3d 143, 155-56 (S.D.N.Y. 2022) (denying motion to dismiss CHRL hostile work environment claim where plaintiff alleged she was treated "less well" than others and provided fewer opportunities for promotion); *Mondelo*, 2022 U.S. Dist. LEXIS 31075, at *20-21 (denying motion to dismiss hostile environment claims); *see Pucino v. Verizon Communications, Inc.*, 618 F.3d 112, 115 (2d Cir. 2010) (hostile environment found based on supervisor denying plaintiff tools which "made it difficult, if not impossible, for her to perform her work properly"); *Vaigasi v. Solow Mgmt. Corp.*, 2014 U.S. Dist. LEXIS 42277, at *36 (S.D.N.Y. 2014) (denying motion to dismiss hostile environment claim where plaintiff alleged he was "treated 'less well' than younger, less qualified employees" and provided examples, such as inequitable distribution of overtime opportunities and assignment).

Further, NYPR ignores that whether the alleged conduct was "severe" or "pervasive" enough to trigger liability under § 1981 "involves a question of fact and is generally inappropriate to determine at the pleading stage of a litigation." *Mondelo*, 2022 U.S. Dist. LEXIS 31075, at *20-

21; *Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007) ("whether a particular work environment is objectively hostile is necessarily a fact-intensive inquiry"). The Second Circuit has "repeatedly cautioned against setting the bar too high" on the standard for stating a hostile work environment claim, *see Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003), and Floyd submits that, at this stage, she has provided sufficient allegations to support her claims. As Judge Failla observed in denying a motion to dismiss hostile environment claims, it is difficult "for courts to perform the extraordinary sensitive and comprehensive analysis necessary to assess a total set of workplace circumstances and determine whether a particular set of words and actions were enough to make that workplace a different, less tolerable environment for the victimized party." *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 259 (S.D.N.Y. 2014) (denying Rule 12(b)(6) motion to dismiss hostile work environment claims). This Court should reach the same conclusion here.

Moreover, while NYPR argues that it does not have sufficient facts underlying many of Floyd's hostile environment claims, that argument is disingenuous, given that its attorneys conducted at least two workplace investigations. In fact, one workplace investigation was conducted by NYPR's current attorney, Joan Gilbride, from July 2018 through at least the Fall of 2018, "when Attorney Gilbride and her colleague at Kaufman Borgeest & Ryan LLP interviewed Floyd and gathered information from her about the discriminatory work environment she had experienced at NYPR." (Am. Compl., ¶ 33.) As a result, NYPR and its attorneys possess facts about Floyd's claims at that time. (*Id*.)

In short, Floyd's allegations give fair notice to NYPR of her hostile environment claims, and thus easily satisfy Rule 8(a)(2). In addition, whether the allegations meet any applicable "severe" or "pervasive" standard for liability or damages is a question of fact that cannot be

resolved on this motion. Thus, the Court should deny NYPR's motion to dismiss Floyd's hostile environment claims in the Third, Sixth and Ninth Causes of Action.

### 4.   <u>Floyd Has Given Fair Notice Of Her Retaliation Claims</u>

With respect to Floyd's retaliation claims, NYPR argues that she has failed to allege an "adverse employment action" or a "causal connection." (Def.'s Mem. at 19.) Once again, those are the elements of a *prima facie* case of retaliation, which Floyd does not have to establish at this point. *See supra* page 17 (citing cases). In any event, Floyd has alleged numerous adverse employment actions, namely: that she was denied advancement or promotion, management "sidelin[ed] her and prevented her from excelling at her job," she was "hazed," she was "denied plum assignments," her editorial ideas were not supported and were disregarded, she was "bullied and harassed" by her managers, she was subjected to a different reporting structure, she was not supported in her job, she was the victim of misinformation and leaked confidential information, and that she was paid less than others who did not complain about discrimination, (*e.g.*, Am. Compl., ¶¶ 5, 7, 21, 34, 39, 42, 47-48, 51). *See Santiago*, 634 F. Supp. 3d at 156 (describing broad types of action that are deemed adverse, including unequal pay and unequal treatment). Similarly, Floyd has expressly alleged that she suffered these adverse actions *because* she had complained about discriminatory conduct at work – *i.e.*, she has alleged "causation." (*E.g.*, Am. Compl., ¶¶ 21, 41, 47, 48, 51.)  She does not have to *prove* "causation" at the pleading stage. *See Mondelo*, 2022 U.S. Dist. LEXIS 31075, at *32 (denying motion to dismiss retaliation claims and noting that arguments as to causation are best left for summary judgment). Thus, NYPR has provided no valid legal basis for dismissing Floyd's retaliation claims in the Second, Fifth or Eighth Causes of Action in the Amended Complaint.

**C.**    **FLOYD'S ASSERTED CLAIMS ARE NOT TIME-BARRED**

NYPR's motion to dismiss any discrimination and retaliation claims outside of the applicable statute of limitations periods, (Def.'s Mem. at 20-24), is futile. That is because, in each cause of action in the Amended Complaint, Floyd expressly acknowledged and made clear that she was seeking relief for claims *within the applicable statute of limitations periods* only. (Am. Compl., ¶¶ 62, 72, 77, 87, 92.)  For § 1981 claims, the limitations period is 4 years (dating back to October 17, 2018). *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). For SHRL and CHRL claims, the limitations period is 3 years (dating back to October 17, 2019). *Taylor v. City of New York*, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016). For NYLL claims, the limitations period is 6 years (dating back to October 17, 2016). *Volpe v. Nassau Cty.*, 915 F. Supp. 2d 284, 293 n.8 (E.D.N.Y. 2013). Thus, given that Floyd only asserts discrimination and retaliation claims within the statute of limitations periods, NYPR's motion to dismiss claims outside those limitations periods is an exercise in futility, and only highlights the fact that it filed the motion to delay getting to the merits in this case.

As to Floyd's hostile environment claims in the Third, Sixth and Ninth Causes of Action, she specifically has alleged a continuing violation, (Am. Compl., ¶¶ 67, 82, 97), which encompasses conduct within and outside the respective limitation periods. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002) ("a hostile work environment claim… will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period"). Floyd has clearly asserted facts showing wrongful conduct that occurred within and outside of the statute of limitations periods with respect to her hostile environment claims. (*E.g.*, Am. Compl., ¶¶ 4-5, 21-22, 25-26, 28-30, 34-36, 39-43.) NYPR wholly ignores the fact that, at this early stage and on a Rule 12(b)(6)

motion, the Court must accept those factual allegations as true and allow claims covered by the continuing violation doctrine to survive this motion to dismiss. *Harris*, 186 F.3d at 249 (reversing dismissal of complaint as time-bared on Rule 12(b)(6) motion where plaintiff alleged continuing violation doctrine, stating that the continuing violation doctrine prevented dismissal of plaintiff's claim where "[a]ll that [the plaintiff] alleges was that he was eligible for promotion until his retirement and that the Police Department failed to grant it to him throughout that time period"); *Mondelo*, 2022 U.S. Dist. LEXIS 31075, at *14-16 (denying motion to dismiss where plaintiff alleged at least one act of harassment within the limitations period, triggering the continuing violation doctrine); *Matagrano v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2021 U.S. Dist. LEXIS 96695, at *6-9 (N.D.N.Y. 2021) (denying Rule 12(b)(6) motion to dismiss on statute of limitations grounds where plaintiff alleged a continuing violation and unlawful conduct within the limitations period, and court was required to accept those allegations as true in ruling on the motion); *see Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997) (stating that "the mere allegation of the existence of such a [continuing] policy would be sufficient to withstand a challenge for failure to state a claim"). Thus, the Court should deny NYPR's motion to dismiss Floyd's hostile work environment claims because they are not time-barred.

## IV.   **CONCLUSION**

For all of these reasons, the Court should deny NYPR's motion to dismiss the Amended Complaint and permit Floyd to conduct discovery to support her claims.

Dated: September 25, 2023

Respectfully submitted,

CERASIA LAW LLC

By_____
    Edward Cerasia II