UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>JAMI FLOYD,<br><br>        Plaintiff,<br><br>   -against-<br><br>NEW YORK PUBLIC RADIO,<br><br>       Defendant.</td><td>23-cv-1096 (ALC)<br><br><u>OPINION & ORDER</u></td></tr>
</table>

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Jami Floyd brings this action against Defendant, New York Public Radio ("NYPR"), for race discrimination, retaliation, and hostile work environment in violation of the 42 U.S.C. § 1981, the New York State Human Rights Law Executive Law, § 292(21) ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-102, and the New York Labor Law § 194 ("NYLL"). Defendant moves to dismiss Plaintiff's First Amended Complaint ("FAC"), ECF No. 18, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, Defendant's motion is **GRANTED** in part and **DENIED** in part**.**

## BACKGROUND

When determining whether to dismiss a case, the Court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). The following facts alleged in the FAC are thus assumed to be true for the purposes of this motion.

Jami Floyd, a Black female, worked for NYPR as the local host for the National Public Radio news program *All Things Considered* from 2015 until 2020. (FAC, ¶¶ 19, 46). Plaintiff notes that she commenced her employment with NYPR based on assurances that she would have

significant editorial voice in the Newsroom and would contribute creatively to the news cycle. (*Id.* ¶ 20).

In December 2017, NYPR leadership promised to elevate Floyd to take over Leonard Lopate's show after he was suspended. (*Id.* ¶ 28). In July 2018, Vice President of News Jim Schachter announced he would be forming a committee to design a new midday show, thus reneging on his promise to give the role to Floyd. (*Id.* ¶ 29). On July 16, 2018, Schachter called Floyd to a meeting and, when she showed up, Chief Human Resources Officer Dana Teplitsky and Executive Editor for News Sean Bowditch were present. (*Id.* ¶ 30). Floyd was concerned with Teplitsky's presence at the meeting, and she asked if she was "being fired." (*Id.*). Schachter told her that she was not being fired, but that she was not getting the midday timeslot, and he "wanted witnesses" present for that news. (*Id.*).

Within an hour after that July 2018 meeting, Floyd met with then-President Laura Walker, expressing her disappointment with the midday host decision, and saying the process was discriminatory. (*Id.* ¶ 31). Floyd also detailed the racially discriminatory treatment she had endured and noted that there was a great imbalance around compensation at WNYC based on race. (*Id.*). Floyd specifically told Walker that, as a Black woman, she felt "devalued," noting that she did not have an office, staff or other appropriate support for a show as demanding as *All Things Considered*, while her Caucasian male counterparts on less demanding shows had large staffs and budgets. (*Id.*) Shortly thereafter, Floyd also had a conversation with NYPR's Deputy General Counsel, Janna Freed, about her complaints of discrimination, which was the first of several such conversations with Freed about discriminatory treatment. (*Id.*) Floyd also spoke with Board Trustee Jonelle Procope about these concerns. (*Id.*)

Floyd alleges that during the applicable statutory period, she earned between approximately $160,000 and $176,000 for hosting *All Things Considered* on the air for 4 hours per day (plus pre-tape time) – among other duties, including, for example, reporting from the field, serving as the legal analyst supporting all WNYC's programming and representing NYPR at off-site fundraising events – and yet was making about the same or less than staff who supported the *Brian Lehrer Show*. (*Id.* ¶ 32). During her employment and within the applicable statute of limitations periods, Floyd also was paid considerably less than Caucasian talk show hosts – some of whom she filled in for – even though she was at least equally as qualified as them and she performed under similar working conditions or at least performed substantially similar work as these hosts. (*Id.*).

From July 2018 through at least the Fall of 2018, NYPR Attorney Gilbride and her colleague at Kaufman Borgeest & Ryan LLP interviewed Floyd and gathered information from her about the discriminatory work environment she had experienced at NYPR as part of a workplace investigation. (*Id.* ¶ 33).

Until Schachter was forced to leave WNYC in 2019, he allegedly displayed open hostility toward the advancement of Black employees, stating in 2018 with the arrival of Depelsha McGruder that "now we have a black COO. What's next, a Black president?" (*Id.* ¶ 35). Schachter also made other racially hostile comments over the years, including one he made just before a NY Association of Black Journalists event, when he said that he could not compete sartorially with all the Black people in the room since, in his view, Black people always would out-dress him. (*Id.*).

In Winter 2019, Floyd had meetings with Leah Johnson, then a new member of the Board of Trustees and an African American. (*Id.* ¶ 38). During her meetings with Johnson, Floyd

expressed great concern about the work culture, environment and mistreatment of Black employees at WNYC. (*Id.*). Floyd also arranged for Johnson to meet off-site with eight Black employees in early-June 2019 – seven of whom later left WNYC, at least in part because of challenges they faced as Black employees. (*Id.*).

In May 2019, WNYC instituted its n-word policy and set up an emergency editorial committee to navigate the use of the word on-air at all hours of the day and night. (*Id.* ¶ 36). It came to be called the "Black Editorial Committee" and members, including Floyd, were provided no additional compensation for their work. (*Id.* ¶ 33).

Throughout her employment, Floyd claimed she was bullied and harassed, including by Program Director Jacqueline Cincotta and Supervising Senior Producer Richard Yeh, which created on-going challenges for her in the Newsroom and prevented her from performing her job duties. (*Id.* ¶ 39). This race-based conduct included, but was not limited to, verbal bullying, a reporting structure different from other similarly-situated, non-Black hosts, and denial of an editor title that was granted to similarly-situated and far less experienced, non-Black employees. (*Id.*).

On June 24, 2019, Floyd lodged a complaint with the Human Resources Business Partner for News, Rebecca Shapiro, about the abuse from Cincotta. (*Id.* ¶ 40). Yet, no action was ever taken by Shapiro or WNYC. (*Id.*) Floyd also had put CEO Laura Walker and Schachter on notice about Cincotta before their departures in 2019, but they also failed to take any corrective action. (*Id.*). Floyd had made similar complaints on November 28, 2018, to WNYC's outside consultant, Equitable, but no action was taken in response to her complaints at that point, either. (*Id.*)

In Summer 2019, new CEO Goli Sheikholesami began at WNYC upon the departure of Walker and Schachter in 2019. (*Id.* ¶ 37). Floyd tried to meet with Sheikholeslami and new Chief

Content Officer Andrew Golis, who also arrived in 2019, on more than one occasion to share her experiences at WNYC, but they did not meet with her until they were in crisis in 2021, with the hiring of a controversial new Editor-in-Chief for the Newsroom. (*Id.*)

In August 2020, WNYC named Floyd as "Legal Editor" after she complained to Human Resources in June 2019, the SAG-AFTRA union, and even the new CEO. (*Id.* ¶ 42). Moreover, WNYC was not going to give Floyd any additional compensation for this role, until the union intervened. (*Id.*). Floyd believes that she was continually paid significantly less than non-Black hosts to whom she should have been compared over several years and through the end of her employment, and that discovery in this lawsuit will reveal this pay inequity. (*Id.*).In 2020, Floyd interviewed for the vacant role of Editor-in-Chief but was passed up for the position when Audrey Cooper, a Caucasian woman who was not a native New Yorker and had no broadcast experience had been chosen for the position. (*Id.* ¶ 43, 44). Over 150 employees signed a petition opposing the hiring of Cooper. (*Id.* ¶ 44). Once Cooper joined the leadership, she demonstrated racial hostility toward employees of color, making suggestive comments that South Asians were laconic and lazy, demeaning one employee of color for having "low metabolism" and disparaging another for "just not getting what we do here." (*Id.* ¶ 47).

In September 2020, Floyd was chosen to run a Race & Justice unit that purported to cover communities of color. (*Id.* ¶ 46). This took Floyd off air to assume responsibility for a desk with no budget or authority to hire staff, and she also made less in annual compensation in 2020 and even less in 2021, when compared to her compensation in 2018 or 2019. (*Id.* ¶ 48).

In June 2021, Floyd recommended hiring a multilingual Arab-American journalist with a degree from Columbia University's Graduate School of Journalism. (*Id.* ¶ 49). Cooper told Floyd that she could not hire this journalist "because he is not Black." (*Id.*). Floyd reported this

comment to WNYC's Chief Human Resources Officer, Monique Jefferson, and Freed, but nothing happened. (*Id.*). At the same time, when Floyd fought to hire many qualified Black reporters, WNYC refused to approve those hires. (*Id.*). NYPR did not authorize any of the hires Floyd suggested for diverse candidates. (*Id.*)

In November 2021, Floyd was reassigned from her writing and editing responsibilities after it was identified that four articles she authored while at the company contained plagiarism. (Def. Mem., ECF No. 21 at 8). Thereafter, NYPR removed from its websites over 40 more plagiarized articles authored by Floyd. (*Id.*). She subsequently resigned on or around April 4, 2022. (FAC ¶ 2.)

## PROCEDURAL HISTORY

In August 2022, Plaintiff sent Defendant a demand letter, alleging race discrimination and retaliation claims against the company. Def. Mem. at 12. The parties then entered into a tolling agreement, effective October 17, 2022, which ended on February 9, 2023. *Id.* Plaintiff commenced this action on February 9, 2023.  ECF No. 1.  Following a pre-motion conference held on June 27, 2023 (ECF No. 15), Plaintiff filed her first amended complaint on July 18, 2023.  ECF No. 18.  NYPR moved to dismiss the first amended complaint on August 25, 2023. ECF No. 20.  Plaintiff filed her Opposition on September 25, 2023.  ECF No. 22.  NYPR filed its Reply brief on October 18, 2023.  ECF No. 23.  This motion is fully briefed.

## STANDARD OF REVIEW

When resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and

citations omitted).  Thus, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). Federal Rule 12(b)(6) "does not impose a probability requirement. at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the truth of the allegations." *Twombly*, 550 U.S. at 545.

## DISCUSSION

### I.   Plaintiff's Claims Are Not Time-Barred.

NYPR argues that Plaintiff's claims based on acts prior to October 2018 are time-barred under 42 U.S.C. § 1981 and that Plaintiff's claims based on acts prior to October 2019 are time-barred under the NYSHRL and the NYCHRL.  For Section 1981 claims, the limitations period is four years (dating back to October 17, 2018). *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). For SHRL and CHRL claims, the limitations period is three years (dating back to October 17, 2019). *Taylor v. City of New York*, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016). For NYLL claims, the limitations period is six years (dating back to October 17, 2016). *Volpe v. Nassau Cty.*, 915 F. Supp. 2d 284, 293 n.8 (E.D.N.Y. 2013). In each cause of action in the Amended Complaint, Floyd expressly acknowledged and made clear that she was seeking relief for claims within the applicable statute of limitations periods only. Am. Compl., ¶¶ 62, 72, 77, 87, 92.

Out of an abundance of caution, the Court clarifies that any of Plaintiff's Section 1981 claims outside of the four-year statutory period, before October 2018, any NYSHRL and NYCHRL claims outside of the three-year statutory period, before October 2019, and any NYLL claims outside of the six-year statutory period, before October 2016, are time-barred. The Court, however, will consider acts outside of the statutory period as background information providing context for Plaintiff's claims. *Johnson v. City of New York*, 2019 U.S. Dist. LEXIS 160198, *20 (E.D.N.Y., Sept. 18, 2019) (citing *Davidson v. LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013) (summary order)).

## II.     Plaintiff Has Sufficiently Pleaded Race Discrimination.

### A.  Section 1981

Section 1981 claims for employment discrimination are recognized where a plaintiff shows that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Harris v. NYC Human Res. Admin.*, 2021 U.S. Dist. LEXIS 162763, at *14 (S.D.N.Y. Aug. 27, 2021) (citing *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020)) (internal quotation marks omitted).

The Second Circuit has held that at a minimum, "employment discrimination claims must meet the standard of pleading set forth in *Twombly* and *Iqbal*, even if pleading a *prima facie* case is not required." *Hedges v. Town of Madison*, 456 F. App'x 22, 23 (2d Cir. 2012) (summary order).  Although "a complaint need not establish a *prima facie* case of employment discrimination[, it] must be facially plausible and must give fair notice to the defendants of the basis for the claim." *Munoz-Nagel v. Guess, Inc.*, No. 12 Civ. 1312 (ER), 2013 U.S. Dist. LEXIS 61710, at *4 (S.D.N.Y. Apr. 30, 2013) (quoting *Barbosa v. Continuum Health Partners, Inc.*,

716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010)). To survive a motion to dismiss on a claim of

employment discrimination under § 1981, a plaintiff must "alleg[e] facts that directly show

discrimination or facts that indirectly show discrimination by giving rise to a plausible inference

of discrimination." *Vega*, 801 F.3d at 87.

 When accepting all facts alleged in Plaintiff's amended complaint as true and drawing all

inferences in her favor, Plaintiff has sufficiently pleaded a cognizable race discrimination claim.

Ms. Floyd, as a Black female employee, is a member of a protected class. (FAC ¶ 1). Moreover,

she met her minimal burden of presenting evidence that she possessed the basic skills necessary

for her performance as a broadcast journalist, legal and political analyst, and television and radio

host. (FAC ¶ 30, 36, 42, 43, 50). "An adverse employment action is a 'materially adverse change

in the terms and conditions of employment,' which can include 'termination of employment, a

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, [or] significantly diminished material responsibilities,' among other

possibilities." *Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 49 (2d Cir.

2014) (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)). NYPR

argues that Plaintiff has failed to state an actionable adverse employment action because the

company gave her the editor title she sought in August 2020 and promoted her to run her own

editorial desk in September 2020.  These facts, standing alone, would certainly extinguish a

claim of adverse employment action. This is not the case here. Plaintiff was passed up for two

opportunities (the midday show in July 2018 and the Editor-in-Chief position in June 2020) she

was not only qualified for but was highly considered for, and in the first instance, even promised.

(FAC ¶¶ 30, 43-44). *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir.

2016) (citations omitted). This Circuit has found that denying promotion constitutes an adverse

employment action. *See Banks v. Gen. Motors, LLC*, 81 F.4th 242, 269 (2d Cir. 2023 ("[i]n addition to terminations of employment and demotions, failure to promote . . . may also qualify as [an] adverse action[],); *see also Beyer v. County of Nassau*, 524 F.3d 160, 163-64 (2d Cir. 2008) (noting that a reasonable jury could find that the position Plaintiff sought was objectively and materially better than the position she occupied and that, accordingly, an adverse employment action had occurred).

Floyd was only given a "Legal Editor" title, despite her ten years of involvement with WNYC, after she complained to Human Resources in June 2019, the SAF-AFTRA union, and the new CEO about the issue. (FAC ¶ 41). Moreover, she alleges that she experienced a progressive decline in annual compensation in 2020 and 2021, when compared to her compensation before she received the Editor title in 2018 or 2019. (FAC ¶ 48). When viewing this evidence in the light most favorable to Plaintiff, the Court finds that Floyd has pleaded an actionable adverse employment action sufficient to withstand a 12(b)(6) motion.

Finally, Plaintiff has plausibly alleged that the adverse action she faced, specifically NYPR's denial to advance or promote her, occurred under circumstances that give rise to racial discrimination. Setting aside the racially hostile comments made by NYPR executives, including then Vice President of News Jim Schachter's 2018 comment, "now we have a black COO. What's next a Black president?", and then Editor-in-Chief Audrey Cooper's 2021 refusal to hire Floyd's recommendation of a qualified Arab-American journalist "because he is not Black," Floyd's allegation that she was denied the midday show position in 2018 and the Editor-in-Chief position in 2020 in favor of " individual[s] outside [her] protected class" is sufficient to raise an inference of discrimination at the initial *prima facie* stage. (FAC ¶ 30, 35, 44, 49), *Littlejohn v. City of New York*, 795 F.3d 297, 312-13 (2d Cir. 2015); *see also D'Cunha v. Genovese/Eckerd*

*Corp.*, 479 F.3d 193, 195 (2d Cir. 2007) (holding that plaintiff's allegation that "one of the individuals who was offered [the] position was eight years younger than [plaintiff]" was "significant enough to support an inference in [plaintiff]'s favor"). That Schachter "wanted witnesses," including NYPR's Chief Human Resources Officer, present when he delivered news that Floyd was passed up for the 2018 midday show position, and that over 150 NYPR employees signed a petition opposing the 2020 hiring of Audrey Cooper, support a plausible inference of racial bias. (FAC ¶ 30, 44).

**B.  NYSHRL and NYCHRL**

Racial discrimination under the NYSHRL is governed by the same standards that apply to Section 1981 claims. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). Therefore, the Court finds that Plaintiff has adequately alleged a plausible racial discrimination claim under NYSHRL § 296.

Plaintiff also alleges a racial discrimination claim under the NYCHRL. The NYCHRL is to be construed more broadly than its state and federal counterparts and claims under the NYCHRL must be analyzed separately and independently. *See Mihalik v. Credit Agricole Cheuvreux N. Am.*, Inc., 715 F.3d 102, 109 (2d Cir. 2013). Under the NYCHRL, Plaintiff must show that his employer treated him less well than other similarly situated employees, at least to some degree for discriminatory reasons. *Id*. at 110 n. 8. Because the Court has concluded that Plaintiff has met the more demanding standards under her federal and state racial discrimination claims, Plaintiff's city claims survive.

Plaintiff's federal, state, and city racial discrimination claims are sufficient to withstand the requirements set forth in *Twombly* and *Iqbal*.

**III.    Plaintiff Has Sufficiently Pleaded Retaliation.**

### A.  Section 1981

To state a retaliation claim, a plaintiff must demonstrate (1) that she engaged in protected activity, (2) of which the employer was aware, and (3) that she suffered a materially adverse action, which (4) was causally connected to the protected activity. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). As the Court assessed *supra*, Plaintiff has adequately pleaded that she suffered material adverse employment actions. An individual "engages in protected activity under § 1981 when she complains about or otherwise opposes conduct that she reasonably believes to have violated § 1981." *Gomez v. City of New York*, No. 12 Civ. 6409 (RJS), 2014 U.S. Dist. LEXIS 113674 at *6 (S.D.N.Y. Aug. 14, 2014) (internal quotation marks omitted); *see Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (holding, in Title VII context, that protected activity includes "formal charges of discrimination ... as well as informal protests of discriminatory employment practices"). Floyd has alleged that she engaged in such protected activity when she complained repeatedly to NYPR senior leadership, Human Resources, and aBoard of Trustees members about the racially discriminatory environment and she lodged complaints with the Human Resources Business Partner for News, WNYC's outside consultant Equitable, the SAG-AFTRA Union, and NYPR's Deputy General Counsel. (FAC ¶ 21, 31, 38, 40, 42).

NYPR argues that Floyd fails to set forth facts sufficient to support causality. "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). The Second Circuit has "not drawn a bright line to

define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (internal quotation marks omitted). "This has allowed [courts] to exercise [] judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Id.* (citing *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)).

When drawing all reasonable inferences in Plaintiff's favor, she has sufficiently alleged retaliatory conduct, namely that she was passed up for promotions in 2018 and 2020, she was denied meetings with CEO Goli Sheikholeslami and Chief Content Officer Andrew Golis about the discriminatory culture at the Newsroom, she experienced a progressive decline in compensation even after receiving a "Legal Editor" title and offer to run the Race & Justice Unit in 2020, she had no budget or authority to hire staff and NYPR denied all of her proposed hiring candidates, and she was subjected to a different reporting structure.  (FAC ¶ 21, 37, 38, 39, 40, 42, 44, 45, 48, 49). Further detail is needed to assess the proper timeline of causality between each of Floyd's reports of discriminatory conduct and any subsequent retaliatory action taken by NYPR. However, the Court takes note of at least the following: Floyd lodged her complaint with the Human Resources Business Partner for News on June 24, 2019, and beginning in 2020, her annual compensation decreased. The passage of six months between Floyd's June 2019 complaint and her progressive decrease in annual compensation beginning in 2020 is sufficient to support an inference of a causal connection. *See Espinal*, 588 F.3d at 129 (finding sufficient causation where six months passed between protected activity and retaliatory conduct).

**A.  NYSHRL and NYCHRL**

As in the federal context, a plaintiff bringing claims under the NYSHRL for retaliation must allege that (1) defendants discriminated—or took an adverse employment action—against him, (2) because he has opposed any unlawful employment practice." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (internal citations omitted); *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 330 (S.D.N.Y. 2020)). Given that Plaintiff has adequately pleaded retaliation under Section 1981, her claims under NYSHRL move forward.

"[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, . . . and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112; *accord Alvarado v. Nordstrom, Inc*., 685 F. App'x 4, 8 (2d Cir. Mar. 29, 2017) (summary order). Plaintiff has demonstrated that she can meet this broadened standard, thus her NYCHRL retaliation claim proceeds as well.

## IV. Plaintiff Has Sufficiently Pleaded Pay Inequality under New York Labor Law § 194.

To establish an equal pay violation of the New York Labor Law § 194, a plaintiff must show that "(1) the employer pays different wages to employees [outside the protected class]; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." *Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 (2d Cir. 2015). A plaintiff "need not demonstrate that [his] job is identical to a higher paid position, but only must show that the two positions are substantially equal in skill, effort, and responsibility." *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001) (internal quotation marks omitted).

Plaintiff has sufficiently pleaded the following facts to support a plausible inference of pay inequality: Floyd was earning between approximately $160,000 and $176,000 for hosting *All Things Considered* on the air for 4 hours per day (plus pre-tape time) – among other duties, including, for example, reporting from the field, serving as the legal analyst supporting all WNYC's programming and representing NYPR at off-site fundraising events – and yet was making about the same or less than staff who supported the *Brian Lehrer Show* (FAC ¶ 32); after her purported promotion to "Legal Editor" and the Race & Justice Unit in 2020, Floyd's compensation decreased (FAC ¶ 48); Floyd and other Black employees were provided no additional compensation for serving on its "Black Editorial Committee" in 2019 though it required monitoring WNYC's use of the n-word on air at all hours of the day and night (FAC ¶ 36); and Floyd's white male counterparts were provided large staffs and budgets on less demanding shows (FAC ¶ 32). Floyd also maintains that NYPR has facts exclusively within its possession concerning the compensation paid to other employees with whom she compares herself, (FAC ¶¶ 32, 42), and thus, discovery is needed as to the compensation paid to those comparators. *See Edelman v. NYU Langone Health Sys*., 2022 U.S. Dist. LEXIS 176681, at *45-47 (S.D.N.Y. 2022) (analysis of pay discrimination with respect to comparators is fact-based inquiry). The Court notes that while Plaintiff has, at minimum, alleged facts sufficient to support an inference of race-based pay discrimination, more evidence is needed to fully ascertain how Plaintiffs' counterparts and employees similarly situated to Plaintiff were compensated.

**V.     Plaintiff's Hostile Work Environment Claims Must Be Dismissed.**

To state a claim of hostile work environment under federal and New York State law, a plaintiff must plausibly allege that his "workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions

of her employment and create an abusive working environment." *Watkins v. N.Y.C Transit Auth.*, No. 16 Civ. 4161, 2020 WL 1888839, at *8 (S.D.N.Y. Apr. 16, 2020) (quotation marks and citation omitted); *see also Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 723–24 (2d Cir. 2010) (same). A plaintiff may satisfy this standard by "demonstrat[ing] either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2001) (quoting *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000)). Conduct that is "episodic" and not sufficiently "continuous and concerted" will not be deemed pervasive. *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (citation omitted). Moreover, a plaintiff must establish that the defendants "create[d] such an environment because of the plaintiff's race." *Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 224 (E.D.N.Y. 2018) (citation, quotation marks, and alterations omitted); *see also Colon v. Fashion Inst. Of Tech. (State Univ. of N.Y.)*, 983 F. Supp. 2d 277, 292 (N.Y.S.D. 2013) (noting that a hostile work environment must have been created because of the plaintiff's "membership in a protected class"). In determining whether a plaintiff has plausibly alleged an actionable hostile environment, courts must look at the "totality of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Littlejohn*, 795 F.3d at 321 (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23 (1993)).

This test has objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and "the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d

365, 374 (2d Cir. 2002)). Generally, incidents of harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano*, 294 F.3d at 374. "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* However, "a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Id.*

Here, Plaintiff's hostile work environment claims do not survive the instant Motion because she cannot demonstrate that NYPR's purported racially hostile environment altered the conditions of her employment such that it unreasonably interfered with her work performance. Plaintiff only suggests that Program Director Jacqueline Cincotta and Supervising Senior Producer Richard Yeh engaged in verbal bullying such that Floyd felt uncomfortable and unwelcomed. (FAC ¶ 39). Without additional details as to the frequency and severity of this conduct, these allegations are too vague to suggest that it "unreasonably interfered" with Plaintiff's work performance. *See Ennis v. Sonitrol Mgmt. Corp.,* 2006 U.S. Dist. LEXIS 2599, 2006 WL 177173, at *9 (S.D.N.Y. Jan.25, 2006) (citations omitted) ("Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency.").

"To establish a ... discrimination claim under the NYCHRL, the plaintiff need only demonstrate 'by a preponderance of the evidence that [he] has been treated less well than other employees because of [a protected characteristic].'" *Mihalik*, 715 F.3d at 109. Even under this broadened framework, Plaintiff's claim of a racially hostile work environment does not stand, as she only describes in conclusory fashion that she was made to feel uncomfortable and unwelcome from her supervisor's conduct, such that it took a toll on her job satisfaction and emotional well-being. (FAC ¶ 39). *See Wilson v. N.Y.P. Holdings, Inc*., No. 05-CV-10355, 2009

WL 873206, at *29 (S.D.N.Y. Mar. 31, 2009) (dismissing hostile work environment claim under the NYCHRL because although the conduct alleged was "offensive," "no reasonable fact finder could conclude that the alleged conduct amounts to more than such petty slights and inconveniences"), aff'd sub nom. *Watson v. N.Y. Pressman's Union No. 2*, 444 F. App'x 500 (2d Cir. 2011).

Accordingly, Plaintiff's hostile work environment claims under federal, state, and city law are dismissed. Because the Court dismisses Plaintiff's hostile work environment claims, Plaintiff's claim that the continuing violation doctrine applies is precluded.

## CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss is **GRANTED in part and DENIED in part**. Plaintiff's following claims survive Defendant's motion to dismiss:

1. Section 1981 Race Discrimination Claim

2. NYSHRL Race Discrimination Claim

3. NYCHRL Race Discrimination Claim

4. Section 1981 Retaliation Claim

5. NYHRL Retaliation Claim

6. NYCHRL Retaliation Claim

7. NYLL Claim

The Court **GRANTS** Plaintiff leave to file a second amended complaint by April 12, 2024. The Parties are hereby **ORDERED** to file a joint status report informing the Court of the status of this action by April 17, 2024.


**SO ORDERED.**

**Dated: March 31, 2024**
**New York, New York**

_____
**HON. ANDREW L. CARTER, JR.**
**United States District Judge**